OBSTETRICIANS-GYNECOLOGISTS, P.C., A NEBRASKA PROFESSIONAL CORPORATION, INDIVIDUALLY AND ON BEHALF OF SIMILARLY SITUATED NEBRASKA PHYSICIANS, APPELLANT, V. BLUE CROSS AND BLUE SHIELD OF NEBRASKA, A NONPROFIT HOSPITAL SERVICE CORPORATION, APPELLEE.

361 N.W.2d 550

Filed February 8, 1985.   No. 83-646.

Edward D. Hotz of Hotz, Kizer & Jahn, P.C., for appellant.

John E. North and John F. Thomas of McGrath, North, O'Malley & Kratz, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, SHANAHAN, and GRANT, JJ.

GRANT, J.

This is an appeal by the plaintiff, Obstetricians-Gynecologists, P.C., a Nebraska professional corporation (hereinafter OB-GYN), from the district court's denial of OB-GYN's petition for a declaratory judgment and the court's denial of certification of the "class" of physicians which OB-GYN sought to represent in this action.

The action was brought by OB-GYN under the Uniform Declaratory Judgments Act, Neb. Rev. Stat. §§ 25-21,149 et seq. (Reissue 1979), seeking to determine the validity of a nonassignment provision in health care contracts issued by

defendant-appellee, Blue Cross and Blue Shield of Nebraska, a nonprofit hospital service corporation (hereinafter Blue Shield).

After trial the court denied the relief sought by OB-GYN. OB-GYN appeals, alleging three assignments of error. The first two assignments may be combined in that they allege generally that the trial court erred in not holding Blue Shield's nonassignment provisions void as a matter of public policy. The third assignment of error alleged by OB-GYN is that the trial court erred "in finding that the plaintiff did not meet the requirements of a class action." For the reasons hereinafter set out we affirm the action of the trial court.

OB-GYN is a corporation of physicians providing health care services to patients. Blue Shield is in the business of writing health care insurance, including insurance for prepaid medical, surgical, hospital, nursing home, dental, and similar services. Its existence is authorized under the hospital service corporations statutes, Neb. Rev. Stat. §§ 21-1509 et seq. (Reissue 1983).

Blue Shield provides health care insurance to its members, who are known as "subscribers," and to certain members of subscribers' families if agreed upon. Subscribers are individuals—most of them belonging to groups such as employee groups, labor unions, or governmental or professional associations. These individuals, either alone or through their groups, enter into contracts with Blue Shield whereby, upon payment of a periodic subscription premium by the subscriber or on his behalf, Blue Shield agrees to pay a certain amount for described health care services contracted for by the subscriber. The amount to be paid is determined by the terms of the insurance contract between Blue Shield and the subscriber.

The hospitals, physicians, and others who provide health care services to the subscribers are known as "providers." Following its "Physician's Voluntary Cost Effectiveness" program, instituted in 1978, Blue Shield entered into separate contracts with providers who wish to participate in Blue Shield's program. The providers who enter into these contracts with Blue Shield are called "participating" providers. Each of

the contracts between Blue Shield and the participating providers requires the providers to accept agreed-upon payments for specified services as payment in full, and requires Blue Shield to pay each participating provider directly.

Providers who have not entered into contracts with Blue Shield to accept agreed-upon payments as payment in full are called "nonparticipating" providers. OB-GYN is a nonparticipating provider.

The amount of benefits paid by Blue Shield does not depend on whether services are provided by a participating or nonparticipating provider. The payment is the same in either case. However, where services are rendered by a participating provider, payment is made directly to the provider by Blue Shield on behalf of the subscriber—as provided in the Blue Shield-subscriber insurance contract. When the services are performed by a nonparticipating provider, on the other hand, payment is made by Blue Shield directly to the subscriber—also as provided in the Blue Shield-subscriber insurance contract. These payment provisions are included in all Blue Shield-subscriber contracts.

It is provided in the Blue Shield-subscriber insurance contract that benefits payable to a subscriber may not be assigned by the subscriber. The nonassignment provision in the Blue Shield-subscriber contract states: "No assignments of any amounts payable under this Contract shall be recognized or accepted by, or binding upon, the Company." Blue Shield's president testified as to the reason that Blue Shield inserted the nonassignment provisions in its contracts with its subscribers. That reason was stated to be that Blue Shield wished to have nonparticipating providers join the Blue Shield program so that they would accept the Blue Shield payment under the policy as payment in full for the medical services rendered, and thus help to keep down the costs of medical services to the subscribers. The only inducement that Blue Shield could offer to any provider was payment directly to the provider.

Prompt payment by Blue Shield directly to participating providers lessens the financial burden of debt collection for those providers, and ensures payment to the participating providers for health care services rendered. In an effort to

collect payment directly from Blue Shield for services it provides to Blue Shield subscribers, OB-GYN (although it is a nonparticipating provider) has taken assignments of Blue Shield subscribers' benefits and submitted them to Blue Shield for payment. Blue Shield, relying on the nonassignment clause in its contracts with its subscribers, refuses to pay OB-GYN directly, but instead sends the payment to the subscriber. It is OB-GYN's attack on the validity of this nonassignment clause that forms the basis for this suit.

With regard to the three assignments of error as a whole, we first note that a declaratory judgment action is sui generis and may involve questions of both law and equity. *S.I.D. No. 32 v. Continental Western Corp.*, 215 Neb. 843, 343 N.W.2d 314 (1983). Insofar as fact questions are concerned in a declaratory judgment action, those issues may be tried and determined as in other civil actions. § 25-21,157. All declaratory judgment decrees may be reviewed as other decrees. § 25-21,155. Pursuant to Neb. Rev. Stat. § 25-1925 (Reissue 1979), insofar as the appeal is one in equity, we review the trial court's finding of fact de novo on the record. With regard to questions of law, we have the obligation to reach independent conclusions with respect to those questions. *Ranger Division v. Bayne*, 214 Neb. 251, 333 N.W.2d 891 (1983); *In re Estate of Corrigan*, 218 Neb. 723, 358 N.W.2d 501 (1984). Also, in our review of this case on the questions of public policy, while our review is de novo, we note that in *Beaver Lake Assn. v. Beaver Lake Corp.*, 200 Neb. 685, 691, 264 N.W.2d 871, 875 (1978), we said, "Courts should be cautious in holding contracts void on ground of public policy and before they do so prejudice to the public interest should clearly appear."

The first two assignments of error may be considered together, since each of those assignments are based on Blue Shield's alleged violation of "public policy" in its nonassignment contractual provisions. In its brief, OB-GYN makes numerous references to public policy, but nowhere is that policy defined, except that OB-GYN alleges in the amended petition that "[p]laintiff [OB-GYN] claims the provision in defendant's [Blue Shield's] policies prohibiting benefit assignments after covered medical services are incurred are [sic]

null and void as being contrary to public policy." ·

Nor is any proof offered by OB-GYN that such allegation correctly states the public policy of Nebraska, except in the form of a citation of one 1892 Nebraska case.

From this case OB-GYN concludes that the public policy of Nebraska is that there must be free alienation of choses in action and that Blue Shield's nonassignment provisions in its contracts are invalid solely because such provisions are against that public policy. In order to determine if Blue Shield's conduct violates a public policy of this state, it is necessary to determine if OB-GYN has proved what that policy is, and if that policy controls this case.

As stated in *United Seeds, Inc. v. Hoyt*, 168 Neb. 527, 531, 96 N.W.2d 404, 407 (1959):

> Public policy has been defined in varying terms but a definition which has been accepted in numerous jurisdictions is as follows: "That principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good. * * * The principles under which the freedom of contract or private dealings is restricted by law for the good of the community." Black's Law Dictionary (3d Ed.), p. 1374.

OB-GYN called four witnesses at the trial and defendant called one witness. No witness testified as to what the public policy of this state is on this matter. The trial court was not asked to take judicial notice of any constitutional provision, any statutory enactment, any legislative intent shown in legislative history in enacting any statutes, any specific declaration of public purpose in any enactment, or any case law aiding a determination of the meaning of the terms in this case. Nor was any evidence adduced, if such evidence would be admissible or relevant, as to any custom or public course of conduct that would indicate what the "public policy" might be as to health care contracts. In short, we, as the reviewing court, are asked to determine the public policy in this area of the law with no guidance as to how that determination should be made.

· We are aware of the general statement in 31 C.J.S. *Evidence* § 34 at 960 (1964): "Courts take notice of the public policy of a

state." Such general statements abound in the law, but it is seldom that the evidentiary problem of how to prove what that public policy is is discussed.

The court in *United Seeds, Inc. v. Hoyt, supra,* was faced with a similar problem in determing public policy in connection with a legislative act. The court in the *United Seeds* case was directed to the specific legislative act, and in considering that act, including the title thereof, found nothing that would give the court any guidance. The court so determined, and stated at 531, 96 N.W.2d at 407: "It is therefore impossible to find a source from which it could be said that there was a declaration of public policy which would permit or require the defendants [to do a certain act]."

In this case neither the trial court nor this court has been directed to any statement or declaration as to the public policy applicable in this case. In that situation we note the cautionary language of this court in *E. K. Buck Retail Stores v. Harkert,* 157 Neb. 867, 887, 62 N.W.2d 288, 301 (1954), wherein we stated:

"It is not the province of courts to emasculate the liberty of contract by enabling parties to escape their contractual obligations on the pretext of public policy unless the preservation of the public welfare imperatively so demands. * * * 'the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.' . . ."

As stated above, we must be careful in our determination whether Blue Shield is, or is not, violating the public policy of this state. In order to decide this issue we examine OB-GYN's contention, in effect, that the public policy of Nebraska is set forth in *Star Union Lumber Co. v. Finney,* 35 Neb. 214, 52 N.W. 1113 (1892). In the *Star Union* case we upheld the assignment of a claim for a loss by fire after the loss occurred, even though the insurance policy expressly prohibited it.

A fuller explanation of the theory underlying the *Star Union* holding was set out in *Maryland Casualty Co. v. Omaha Electric L. & P. Co.,* 157 F. 514 (8th Cir. 1907), where the Eighth

Circuit Court of Appeals, in interpreting Nebraska law, held that the nonassignment provision in an employer's insurance policy had no application to the assignment of a cause of action when the cause of action had already arisen under the contract and the contract had expired.

The *Star Union* opinion deals with the nonassignment issue in two sentences at 223, 52 N.W. at 1116, and gives no reasoning for such a holding. The *Star Union* case has never been cited in Nebraska on the nonassignment point. How this fleeting reference in 1892 regarding a fire insurance policy sets out the public policy of Nebraska in 1982 with regard to a medical insurance policy is not argued.

*Maryland Casualty* notes that the "recognized reasons" for prohibition of the assignment had ceased, that the insurance company's liability had become fixed, and that, in that situation, the free alienability of a chose in action ought to be upheld. Generally, commentators and courts, like the eighth circuit in *Maryland Casualty*, have given three theories for upholding an assignment in the face of a nonassignment provision: (1) The parties did not intend the nonassignment provision to apply to rights to receive payments, but only to the duties under the personal contract; (2) The reason for the prohibition ceased because the insurer's risks and liabilities under the contract became fixed when the insured event occurred; and (3) The public policy supported free alienability of a chose in action.

The first two theories are clearly inapplicable in this case. Concerning the first theory, Blue Shield obviously intends the nonassignment provision to apply after the subscriber has attained the right to benefits. It is through this clause that Blue Shield refuses to pay nonparticipating health care providers directly, and thus to encourage the nonparticipating providers to participate in the Blue Shield program. Although its insured risk may not increase by such an assignment, its negotiating power for lower health costs is seriously affected. Furthermore, reading *Star Union* and *Maryland Casualty* in light of the public policy and equity questions before those courts, it is important to distinguish the insurance contracts in those cases from that of Blue Shield in another way. Both the insurance

contracts in *Star Union* and *Maryland Casualty* required the avoidance of the entire contract on assignment. The Blue Shield contract does not avoid payment on assignment, it simply claims the contracted right to pay the subscriber with whom it contracted. Many contracts commentators have recognized the negative weight of an avoidance penalty in the public policy balance; that weight is not present here. See 3 S. Williston, A Treatise on the Law of Contracts § 422 (3d ed. 1960).

Because the first two theories of avoidance of nonassignment clauses are simply inapplicable, the basic theory on which OB-GYN must rest its position is the policy favoring free alienability of a chose in action. While this policy is significant and may reflect a public policy, it is not paramount and must be balanced against a very strong policy, recognized in many cases in Nebraska and in authoritative texts, favoring the freedom to contract. In *Murphy v. City of Plattsmouth*, 78 Neb. 163, 165-66, 110 N.W. 749, 750 (1907), we said:

> The contract in express terms provides that "the second party (Fanning) shall not assign or transfer this contract or sublet any of the work embraced in it." The terms and conditions of a contract have the force of law as to those who are parties thereto. *Lowry v. Inman*, 46 N.Y. 129. In *City of Omaha v. Standard Oil Co.*, 55 Neb. 337, the plaintiff claimed as assignee under a contract containing a stipulation of this character, and this court held that the contract was nonassignable. Counsel there advanced the proposition that the stipulation was merely directed against the assignment of the obligation resting upon the assignor by virtue of the contract, and was not intended to prevent an assignment of the money to be earned thereunder. But this court refused to adopt that view, and disposed of the matter in these words: "But it is needless for us to speculate on the motives for the city's action. It is enough for us to know—whatever its reasons may have been—that it has, in plain language, stipulated against an assignment of the contract. That stipulation is valid and must be enforced. To hold that it covers some, but not all, of the rights and obligations arising out of the contract would be, it seems to us, an inexcusable perversion of its

terms."

As stated in 14 S. Williston, A Treatise on the Law of Contracts § 1630 at 11-12 (3d ed. 1972):

Although the power of courts to invalidate bargains of parties on grounds of public policy is unquestioned and is clearly necessary, the impropriety of a transaction should be convincingly established in order to justify the exercise of the power.

"If there is one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that contracts when entered into freely and voluntarily, shall be held good and shall be enforced by courts of justice."

See, also, 4 A. Corbin, Corbin on Contracts § 872 (1951); 3 S. Williston, *supra*.

While the policy of free alienability of a chose in action is important, the right to contract as narrowly or broadly as the parties desire is also important. OB-GYN recognizes this right to freedom of contract and uses that right to support its contention that subscribers should be free to contract with OB-GYN in any way they want and thus assign their benefits. What OB-GYN will not recognize is that the subscribers and Blue Shield have previously freely contracted not to assign benefits under the policies.

Further, Blue Shield has presented evidence to show its nonassignment clause is a valuable tool in persuading health care providers to participate in its physician's voluntary cost effectiveness program and accept set fees for health services, keeping health care costs down and passing that savings on to its subscribers, who number 450,000 in Nebraska. Such evidence indicates a far stronger public policy than that relied on by OB-GYN.

In *Kent General Hospital v. Blue Cross, etc.*, 442 A.2d 1368 (Del. 1982), and *Augusta Medical Complex, Inc. v. Blue Cross*, 230 Kan. 361, 634 P.2d 1123 (1981), the Delaware and Kansas Supreme Courts had a chance to address the problem that is before us, and upheld the nonassignment clauses. The Delaware and Kansas courts noted, among other policy

considerations, the authorizing statutes under which Blue Shield's corporations in their respective states were formed. In Kansas the statutes specifically authorized a cost containment purpose and in Delaware specifically exempted Blue Cross and Blue Shield from all other provisions in insurance laws. In Nebraska the hospital service corporations statutes, §§ 21-1509 et seq., under which Blue Shield is set up, are charged with "the primary purpose of operating a nonprofit hospital service corporation to provide for hospital care on a service, prepayment, or other basis as provided in contracts or subscription agreements issued thereby." Only insurance laws not conflicting with the act apply.

Although the Nebraska statute under which Blue Shield is organized is more general than those under which the Kansas and Delaware Blue Cross and Blue Shield corporations were formed, the policy we can glean from the statute also weighs on the side of Blue Shield. The uniqueness of the health service corporation is recognized by exempting them from insurance provisions which conflict with their enabling legislation, by the requirement that they be nonprofit, and by the 1951 amendment designed to increase their contracting powers. In short, to the limited extent our statute speaks, it favors the position of Blue Shield.

For the foregoing reasons we conclude that appellant, OB-GYN, has failed to show that the nonassignment provision in Blue Shield should be called void for public policy reasons.

OB-GYN's third assignment of error is that the trial court erred in failing to certify this as a class action. The trial court held that OB-GYN failed to prove that there were other members of the class which OB-GYN sought to represent and which satisfied the requirements of Neb. Rev. Stat. § 25-319 (Reissue 1979): "Class actions; representation. When the question is one of a common or general interest of many persons, or when the parties are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

The trial court was correct, for, although Nebraska's class action statute is broad, something more than the suggestion of a class is necessary to fulfill the parties requirement.

The judgment of the trial court is affirmed in all respects.

AFFIRMED.

CAPORALE, J., not participating.