GUS T. PALLAS, INDIVIDUALLY, GEORGE A. PALLAS, AND GUS T. PALLAS, PERSONAL REPRESENTATIVE OF THE ESTATE OF JAMES C. PALLAS, DECEASED, APPELLEES, V. LEON F. BLACK, APPELLANT.
414 N.W.2d 805

Filed October 30, 1987.    No. 85-997.

Warren S. Zweiback and Scott H. Rasmussen of Zweiback, Flaherty, Betterman & Lamberty, P.C., for appellant.

James T. Gleason of Swarr, May, Smith & Andersen, P.C., for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

Defendant, Leon F. Black, appeals from a decree of specific performance entered in favor of the plaintiffs-appellees, Gus T. Pallas, individually, George A. Pallas, and Gus T. Pallas, personal representative of the estate of James C. Pallas, deceased, ordering the purchase by Black of certain improved real estate from plaintiffs, directing Black to pay plaintiffs $13,600 due pursuant to the agreement together with $842.23 for real estate taxes, and directing plaintiffs to convey "clear title" in and to the property to Black. Black's six assignments of error may be resolved by determining whether (1) there existed an enforceable contract for the purchase of the property by Black, (2) the plaintiffs evidenced an ability to convey marketable title thereto, and (3) specific performance is the appropriate remedy. We affirm.

The property, commonly known as 2727 Q Street, Omaha,

Douglas County, Nebraska, was acquired in equal shares by Thomas Pallas and his brother, James C. Pallas, on October 9, 1946. Thomas died in 1968, leaving his share to his widow, Fania Pallas. On September 21, 1968, Fania transferred her interest by quitclaim deed to her sons, the plaintiffs Gus and George, in equal shares. Subsequently, George either gave his share to Gus or appointed Gus as his representative in the management of the property. In any event, George testified he stood "ready" to execute a deed transferring whatever interest he might have to Black.

On September 9, 1977, James and his wife, Dorothy, executed a nondurable power of attorney appointing James' nephew Gus their attorney in fact for the purpose of handling and taking "care of our financial affairs, and to [sic] all matters pertaining thereto."

James was injured in a fall sometime in 1979, and thereafter resided in a nursing home until his death on April 11, 1982, at the age of 95. Gus and George visited their uncle at the home at least every other day. During some of these visits, James did not understand business questions his nephews tried to discuss, but at other times he did. James' last will and testament, dated March 10, 1977, devised all his property to his wife and named Gus as executor. The will further provided, however, that if Dorothy should die before James, his undivided one-half interest in the subject property was to be inherited by Gus and his wife, Rose. James' will was admitted to probate on May 20, 1982, and Gus was appointed as the personal representative of his uncle's estate. The probate proceeding, by failing to name Dorothy as one of James' heirs at the time of his death, establishes that Dorothy died before her husband and that, as a consequence, title to James' undivided one-half interest in the subject property vested in Gus and Rose.

The parties stipulated that at all times relevant to this litigation, George's wife, Finija, and Gus' wife stood ready, willing, and able, at the request of their respective husbands, to execute any documents reasonably required to effect the transfer of the property to Black. Gus testified that at all times relevant to this litigation, he has been ready, willing, and able to convey the property to Black, both on his own account and on

behalf of his Uncle James' estate.

In May 1975, the property was leased for a term of 18 months to Pancho's, Inc., a corporation controlled by Black and on behalf of which corporation Black signed the lease. Pancho's operated a tavern on the property, having purchased the business from its previous operators. Black testified that in this purchase he, acting as Pancho's, Inc., had acquired "all of the furniture, bar stools and, to the best of [his] knowledge, the back bar . . . everything that was in the building." The record indicates, however, that the bar and back bar were not in fact transferred to Black by Pancho's predecessors in title to the business.

On September 23, 1977, the property was again leased to Pancho's for a term of 1 year, with two 1-year extension options. Black again signed this lease on behalf of Pancho's. Pancho's exercised both of its extension options under this second lease, thereby extending the lease through October 31, 1980.

In the summer of 1980, Black initiated discussions with Gus about buying the real estate. Following those discussions, Black signed and sent the following letter to Gus:

July 9, 1980

. . . .
Dear Gus,

I hereby agree to pay $20,000.00 for the premises located at 2727 Q Street. The $20,000.00 will be paid as agreed upon with a down payment of $5,800.00. The balance with 11% interest will be paid in monthly payments over 4 years, no payment to be less than $300.00. Also, I will continue to make the monthly rent payments for the duration of the lease which expires October 31, 1980.

A check for $5,800.00 is attached herewith. The final documents will be drawn up by my attorney for your review and approval along with the schedule of payments as soon as possible.

It is my intention to begin removing various items from the building beginning this Friday and continuing until completed.

Very truly yours,

Leon F. Black

Gus testified that this letter expressed the terms of the agreement which had been reached between himself and Black. Accompanying the letter was a $5,800 check, drawn on Black's behalf, payable to Gus' order.

After July 9, 1980, the only key to the building was in Black's possession. The weekend following receipt of the letter of July 9, Gus visited the property and found a crew of laborers removing the "fancy, old-fashioned ceiling" and wall paneling from the property. At a later time, the bar and back bar were removed as well.

After July 9, 1980, plaintiffs made no effort to lease the property to anyone, viewing the property as belonging to Black. Black, however, did take steps to lease the property. On November 29, 1982, he, as "Black & Associates," executed a document captioned "Business Property Lease," purporting to lease the property for a term of 1 year and 11 months to Kathleen Alston Curtis, to be used by her to operate a tavern, for a rental of $150 per month, total rent being $3,450 over the term of the lease. Black testified that he entered into this lease as an accommodation to Gus, but admitted he never informed Gus of that fact. Plaintiffs continued to pay the real estate taxes as they came due through March 27, 1984, a total amount of $842.23.

On August 28, 1980, Black wrote and signed the following letter to Gus:

Dear Gus,

Enclosed herein is a check in the amount of $430.00 for 2 months rent, and also a check in the amount of $600.00, which is the minimum monthly payment we agreed to. This monthly payment for the land contract will be properly computed with a schedule of payments in the near future.

You should be hearing from Roy Breeling, our attorney, to obtain the information he needs to prepare these papers.

Sorry for the delay, but I've been super busy.

Very truly yours,

Leon F. Black

. . . .

cc: Roy Breeling

A Pancho's, Inc., check in the amount of $430 and a check drawn by Black on the same account as the $5,800 check accompanying the July 9, 1980, letter accompanied this letter.

In accordance with Breeling's request, Gus delivered to Breeling a copy of the power of attorney from James and the abstract of title to the property. A letter to Gus from Breeling dated November 11, 1980, acknowledged receipt of the abstract, and on April 13, 1981, Breeling advised Gus to treat the $5,800 and $600 checks as "earnest money deposits," but Breeling never produced a writing which, in Gus' opinion, accurately reflected the agreement he and Black had reached.

The building was permitted to deteriorate to the point that it was ultimately condemned as a nuisance and torn down by the city of Omaha sometime after 1982.

We begin by noting that an action for specific performance is an equitable matter triable de novo on appeal to this court. *III Lounge, Inc. v. Gaines*, 217 Neb. 466, 348 N.W.2d 903 (1984). As such, we try the factual issues presented de novo on the record and reach a conclusion independent of the findings of the trial court, provided that where the credible evidence is in conflict on a material issue of fact, we consider, and may give weight to, the fact the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Johnson v. NM Farms Bartlett, ante* p. 680, 414 N.W.2d 256 (1987); *Hughes v. Enterprise Irrigation Dist., ante* p. 230, 410 N.W.2d 494 (1987); *Platte Valley Fed. Sav. & Loan Assn. v. Gray, ante* p. 135, 409 N.W.2d 617 (1987); Neb. Rev. Stat. § 25-1925 (Reissue 1985). Of course, we are obligated to reach our own independent conclusions on the

questions of law presented. *OB-GYN v. Blue Cross*, 219 Neb. 199, 361 N.W.2d 550 (1985); *In re Estate of Corrigan*, 218 Neb. 723, 358 N.W.2d 501 (1984); *Ranger Division v. Bayne*, 214 Neb. 251, 333 N.W.2d 891 (1983).

In connection with the first issue, Black argues that there exists no sufficient written memorandum of the agreement to purchase the property such as to satisfy the requirements of Neb. Rev. Stat. § 36-105 (Reissue 1984). That statute provides in relevant part: "Every contract . . . for the sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party by whom the . . . sale is to be made."

Black's argument is based in part upon the premise that the foregoing statutory language means that the vendor must sign any document which purports to be a memorandum of an agreement to sell real estate. That premise, however, is erroneous.

More than a hundred years ago, in *Gartrell v. Stafford*, 12 Neb. 545, 11 N.W. 732 (1882), this court announced the rule that to authorize specific performance under a statute of frauds in all material respects identical to § 36-105, only the party to be charged need have signed the memorandum. In so holding, this court examined English precedent and concluded: "It is sufficient if the contract or memorandum thereof is signed by the party to be charged, that is, by the vendor . . . ." *Id.* at 553, 11 N.W. at 735. As in subsequent cases, the vendor in *Gartrell* was the person to be charged, and the *Gartrell* court's use of the word "vendor" was intended only to identify the party in the case before it as "the party to be charged." E.g., *Krueger v. Callies*, 190 Neb. 376, 208 N.W.2d 685 (1973); *Horn v. Stuckey*, 146 Neb. 625, 20 N.W.2d 692 (1945). In this case Black is the party to be charged, and, therefore, it is his signature which is required.

Black also asserts that his letter of July 9, 1980, cannot support an order of specific performance because it does not contain a sufficient statement of the terms of the agreement to serve as an adequate memorandum. This court stated the applicable rule in *Hansen v. Hill*, 215 Neb. 573, 578, 340 N.W.2d 8, 12 (1983):

" 'A memorandum, in order to make enforceable a contract within the Statute [of Frauds], may be any document or writing, formal or informal, signed by the party to be charged or by his agent actually or apparently authorized thereunto, which states with reasonable certainty, (a) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, and (b) the land, goods or other subject-matter to which the contract relates, and (c) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made.' "

See, also, *David v. Tucker*, 196 Neb. 575, 244 N.W.2d 197 (1976). Black's letter of July 9, 1980, clearly satisfies these requirements.

Having concluded that the first issue must be resolved adversely to Black, we turn our attention to whether plaintiffs evidenced an ability to convey marketable title. While Black does not question the adequacy of the language of the power of attorney James executed to empower Gus to enter into an agreement to sell James' interest in the property, Black does urge that James was not competent to so authorize Gus. However, the question of James' competency at the time he executed the power of attorney becomes immaterial in view of his earlier testamentary disposition. While Black suggests no evidence of marketable title in plaintiffs was presented to him, the fact of the matter is that the record establishes plaintiffs provided Black's attorney with an abstract of title and that no defect in plaintiffs' title has been claimed.

Thus, we reach the third issue, whether specific performance is an appropriate remedy. We have said that if one party cannot enforce substantial performance, equity will not decree specific performance at the instance of the other party. *Farmers Underwriters Assn. v. Eckel*, 185 Neb. 531, 177 N.W.2d 274 (1970). However, the fact that the remedy of specific performance is not available to one party to a contract is not sufficient reason for refusing specific performance to the other party. *Id*. Want of mutuality in respect to the remedy of specific performance in a suit by vendors of land to enforce the contract

of purchase is not a defense where the vendors complied with or tendered performance of their contractual obligations. *Perry v. Ritze*, 110 Neb. 286, 193 N.W. 758 (1923). Plaintiffs tendered performance of their contractual obligations by executing appropriate deeds conveying their respective interests to Black. Further, plaintiffs, at all times relevant to this litigation, remained ready, willing, and able to tender performance of their contractual obligations. The doctrine of mutuality will not prevent a court of equity from ordering specific performance under such circumstances. *Id*. See, also, *Reifschneider v. Nebraska Methodist Hospital*, 212 Neb. 91, 321 N.W.2d 445 (1982), which holds that a party seeking specific performance must show his or her right to the relief sought, including proof that he or she is ready, willing, and able to perform his or her obligations under the contract.

Finally, Black objects to the order of specific performance because the building has been torn down. Generally, the mere fact that the value of property which is the subject of a contract has increased or diminished since the contract was executed will not warrant a court in refusing to grant a decree of specific performance, absent circumstances indicating fraud or bad faith. *Sinclair Refining Co. v. Miller*, 106 F. Supp. 881 (D. Neb. 1952); *City of University Place v. Lincoln Gas & Electric Light Co.*, 109 Neb. 370, 191 N.W. 432 (1922). There is no showing in the record before this court that plaintiffs acted fraudulently or with bad faith.

We conclude from our review that the judgment of the district court should be, and hereby is, affirmed.

AFFIRMED.