**ST. FRANCIS REGIONAL
MEDICAL CENTER**

v.

**BLUE CROSS BLUE SHIELD
OF KANSAS.**

No. 92–1580–PFK.

United States District Court,
D. Kansas.

Dec. 30, 1992.

Richard C. Hite and Arthur S. Chalmers, of Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for plaintiff.

Gary D. McCallister and Mark A. Buck, of Davis, Wright, Unrein, Hummer & McCallister, Topeka, KS, Alan L. Rupe, Steven J. Rupp and Thomas L. Steele, of Alan L. Rupe Law Offices, P.A., Payne H. Ratner, Jr., of Ratner, Mattox, Ratner, Brimer & Elam, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

The plaintiff, St. Francis Regional Medical Center, a nonprofit Kansas corporation, has brought the present action against Blue Cross Blue Shield of Kansas, Inc., seeking a determination that recent state legislation relating to Blue Cross is unconstitutional and that portions of the insurance policies issued by Blue Cross violate public policy. Specifically, St. Francis contends that the nonassignment clause utilized by Blue Cross in its insurance policies violates the Kansas public policy supporting free assignment of choses of action. St. Francis also contends that Senate Bill No. 66, L.1992, Ch. 196 (amending K.S.A. 40-19c06), violates the prohibition on special legislation and the guaranty of equal protection contained in the Kansas Constitution.

This action was originally filed by St. Francis in Sedgwick County District Court. On November 30, 1992, the action was removed by Blue Cross to this court. Blue Cross moved to dismiss the action on December 7. On December 16, St. Francis moved for a preliminary injunction preventing Blue Cross from "refusing to honor assignments" made by Blue Cross insureds to St. Francis after the current provider agreement between Blue Cross and St. Francis expires at the end of this month. St. Francis filed its brief in support of this motion for injunctive relief five days later. A hearing on the present matter was originally set for December 22. At the request of the parties, the hearing was set over for one week. On December 29, 1992, the court conducted a hearing in which the parties were extended the opportunity to address the issues raised by the motions submitted to the court. In addition, during the course of this hearing, the parties also introduced into the record certain stipulations for purposes of resolving the motion to dismiss. At the conclusion of the hearing, the court found that the present action should be dismissed. Consistent with the statements of the court at that time, and for the reasons explained more fully here-in, the court hereby grants defendant Blue Cross's motion to dismiss.

Blue Cross is currently a mutual life insurance company organized under K.S.A. 40-501. Traditionally, however, Blue Cross operated as a nonprofit medical and hospital service company organized under K.S.A. 40-19c01. In 1991, the state legislature enacted K.S.A. 40-19c12, requiring Blue Cross to convert to either a mutual life insurance company under Article 5 of Chapter 40, or a mutual company other than life under Article 12 of Chapter 40. Blue Cross became a mutual life insurance company on July 1, 1992, pursuant to the election required by K.S.A. 40-19c12.

As a nonprofit insurer under Article 19c, Blue Cross was expressly required by the legislature to adopt procedures to control the growth of health care costs. One of the tools Blue Cross has utilized in fulfilling that mandate has been the use of provider agreements with health care providers, coupled with clauses in its insurance policies prohibiting the assignment of benefits.

If a health care provider has not entered into a contracting provider agreement with Blue Cross, persons receiving services from that provider cannot assign their benefits to Blue Cross directly. Instead, the insured person must pay the provider, and then seek reimbursement from Blue Cross. On the other hand, if a health care provider has obtained a contracting provider agreement with Blue Cross, it may bill Blue Cross directly for any services rendered.

Under the contracting provider agreement, the hospital agrees to accept payment from Blue Cross as payment in full, and to hold the insured harmless for any balance in excess of Blue Cross's maximum allowable payment. The contracting provider agreement also provides for Blue Cross review of hospital services and other cost containment devices.

This system was upheld by the Kansas Supreme Court in *Augusta Medical Complex v. Blue Cross*, 230 Kan. 361, 634 P.2d 1123 (1981). In that case, a group of Kansas hospitals challenged Blue Cross's use of nonassignment clauses in its insurance

policies, contending that these provisions violated a general public policy favoring free assignment of choses in action. The Supreme Court held that this policy was insufficient to invalidate the nonassignment clauses at issue, given the legislative mandate extended to Blue Cross to contain skyrocketing hospital costs.

On April 16, 1992, Blue Cross issued a request for proposal to all Wichita hospitals having more than two hundred beds. There are three hospitals of this size in Wichita. The request invited these hospitals to submit competitive bids for provider contracts with Blue Cross, under which two hospitals would be chosen as contracting hospitals effective January 1, 1993.

Only one hospital, HCA Wesley Medical Center, responded. Neither of the other hospitals, including St. Francis, issued any bid. In subsequent correspondence, St. Francis confirmed its intention not to submit a bid with Blue Cross under the terms of the request for proposal.

In response to Blue Cross's motion to dismiss, St. Francis has argued that the motion actually seeks summary judgment and contends that it is premature to grant that relief at this time. Toward that end, St. Francis has filed an affidavit pursuant to Fed.R.Civ.P. 56(f) stating that further discovery needs to be completed. The court finds that Blue Cross's motion is appropriately addressed as a motion to dismiss. The issues raised in that motion are purely legal in nature, and the court finds that they may be decided without resort to making findings of fact not contained in St. Francis's complaint.

Although St. Francis has repeatedly emphasized the allegedly wrongful conduct of Blue Cross during the discourse between the parties during 1992, that conduct is not at issue here. St. Francis has not, for example, asserted claims of estoppel or detrimental reliance against Blue Cross in an attempt to preserve its existing provider care contract with that company. Rather, it has sought a legal determination that the nonassignment clauses are inherently illegal. Thus, while issues of the relative economic impact of the termination of the ex-

isting contractual relationship and the underlying subjective motivations of the parties which led to that termination might be relevant to such a claim (or to St. Francis's motion for injunctive relief), they are not relevant to the issue currently before the court: whether the state legislature's enactment of Senate Bill No. 66 offends various provisions of the Kansas Constitution, or whether nonassignment clauses represent a per se violation of Kansas public policy.

This court has previously addressed the use of Blue Cross contracting provider agreements in *Reazin v. Blue Cross & Blue Shield*, 635 F.Supp. 1287 (D.Kan. 1986) and 663 F.Supp. 1360 (D.Kan.1987). The various federal antitrust claims raised in *Reazin* have not been raised here. The court held that *Augusta* was not controlling in that case since the termination of the provider agreement there occurred by the unilateral action of Blue Cross. The plaintiff hospital wished to maintain a provider agreement with Blue Cross, but the insurer both terminated the provider agreement and refused to offer the hospital any new provider agreement. The court noted that under these circumstances "there was no question of a hospital refusing to join." 635 F.Supp. at 1334. In the present case, on the other hand, St. Francis was extended the opportunity to bid, which it declined to exercise.

## I. ERISA PREEMPTION

In its motion to dismiss, Blue Cross contends that the majority of its policies are employee health benefit policies covered under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, and that any state law requiring free assignment is preempted by federal law. Under 29 U.S.C. § 1144(a) (§ 514(a) of ERISA), the federal act preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."

The Supreme Court has broadly interpreted the "relates to" language of ERISA preemption. *Shaw v. Delta Air Lines*, 463 U.S. 85, 98, 103 S.Ct. 2890, 2900,

77 L.Ed.2d 490 (1983). A state law "relates to" an employee benefit plan when it has "a connection with or reference to such a plan." *Id.* at 96–97, 103 S.Ct. at 2898–2900. Under this test, a state law may be preempted if it relates to an ERISA plan, even if the law was not specifically intended to affect such a plan or if the effect is only indirect. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). On the other hand, a law does not relate to an ERISA plan within the meaning of the preemption statute if it affects the plan only in a "tenuous, remote, or peripheral" manner. *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21.

■ Observing that there was no "simple test" for resolving the question of whether a given law "relates to" a plan, the Tenth Circuit has noted that cases finding such a relationship follow four general types.

First, laws that regulate the type of benefits or terms of ERISA plans. Second, laws that create reporting, disclosure, funding, or vesting requirements for ERISA plans. Third, laws that provide rules for the calculation of the amount of benefits to be paid under ERISA plans. Fourth, laws and common-law rules that provide remedies for misconduct growing out of the administration of the plan.

*National Elevator Industry v. Calhoon,* 957 F.2d 1555, 1558–59 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992) (quoting *Martori Bros. Distrib'rs v. James–Massengale,* 781 F.2d 1349, 1356–57 (9th Cir.), *cert. denied,* 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986)). *See also Monarch Cement v. Lone Star Industr.,* 982 F.2d 1448 (10th Cir.1992); *Kelso v. General American Life Ins.,* 967 F.2d 388 (10th Cir.1992); *Aetna Life Ins. v. Borges,* 869 F.2d 142, 146–47 (2d Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989) (a law relates to an ERISA plan if it has "an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit"). ERISA preemption is designed in part to ensure that plans and their sponsors are subjected to a uniform body of benefit law, thereby preventing inefficiencies working to the detriment of plan beneficiaries. *See Monarch,* at 1450 (citing *Ingersoll–Rand,* 498 U.S. at 141–42, 111 S.Ct. at 484).

■ The court finds preemption here. The general state case law favoring free assignability of benefits would, if found applicable herein, directly affect the plan by nullifying one of the most important provisions contained in the plan. It would directly affect the level of benefits each employee could expect under the plan. And it would seriously affect the administration of the plan. Finally, preemption fits with the purposes of ERISA preemption, since a contrary finding would greatly impair the ability of each plan sponsor to obtain similar benefits.

The Eighth Circuit has addressed a similar situation. In *Arkansas Blue Cross and Blue Shield v. St. Mary's Hospital,* 947 F.2d 1341, 1344–45 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 2305, 119 L.Ed.2d 227 (1992), the court held that an Arkansas statute mandating the assignability of insurance benefits was preempted by ERISA.[1] The court found that the statute related to the plan since it would (1) negate a provision contained in an ERISA plan (by nullifying the effect of the nonassignment clause); (2) have a direct impact on ERISA entities and the structure of the plan; (3) have a direct impact on administration of the plan; and (4) have an economic impact on the plan. The court further found that application of ERISA was consistent with other provisions, specifically 29 U.S.C. § 1056(d)(1), which provides express limitations on assignability of pension benefits.

---

1. Ark.Code Ann. § 4–58–102 (1987) provides that "[a]ll bonds, bills, notes, agreements, and contracts, in writing, for the payment of money or property, or for both money and property, shall be assignable." The Arkansas Supreme Court has held that this provision requires Arkansas Blue Cross & Blue Shield to honor any assignment of insurance benefits made by a plan beneficiary. *American Medical Int'l v. Arkansas Blue Cross & Blue Shield,* 299 Ark. 514, 773 S.W.2d 831 (1989).

In its response, St. Francis relies entirely on the decision of the Supreme Court in *Mackey v. Lanier Collections Agency & Service*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1985), in which the Court held that a state garnishment law was not preempted by ERISA. The decision in *Mackey* was addressed at length by the Eighth Circuit in *Arkansas Blue Cross*, and found to be distinguishable. Unlike the assignment statute which was before it, the Eighth Circuit pointed out that

state garnishment and escheat statutes do not shift control over benefit distribution. Neither do they negate a proper ERISA provision. Additionally, in *Mackey*, the Supreme Court significantly relied on a "sue and be sued" clause in the ERISA statute as support of its holding. The Court reasoned that because the "sue and be sued" clause contemplates execution of judgments but does not provide a method for doing so, state law methods for collecting money judgments must remain undisturbed. *Mackey*, 486 U.S. at 833–34, 108 S.Ct. at 2187. This "sue and be sued" language is not applicable to the voluntary assignment of ERISA benefits. Accordingly, *Mackey* does not control the issue before this court.

947 F.2d at 1347–48.

The Eighth Circuit also found the decision in *Mackey* distinguishable on the basis of the explicit Blue Cross plan language barring assignments. In *Mackey*, the Supreme Court based its decision, that employee welfare benefits were subject to garnishment, upon the fact that Congress, while explicitly prohibiting any assignment of pension benefits under 29 U.S.C. § 1056(d)(1), had not explicitly barred the assignment of welfare benefits. As the Eighth Circuit pointed out, the *Mackey* decision was not applicable to the issue before it, since the failure of Congress to expressly legislate the legality of the assignment of welfare benefits "does not mean that Congress left the door open for states to impose such a rule. If Congress intended that a mandatory rule govern the assignment of welfare benefits, it could have easily provided for such a rule, as it

did in the case of pension benefits." 947 F.2d at 1349. Unlike the preemption of state laws governing garnishment, which would essentially overlap the bar on assignments under § 1056(d)(1), ERISA preemption of state law as to the assignability of claims does not. Instead, it merely leaves to each plan the option of whether to permit assignment. *Id.* at 1350.

Other courts have reached similar results. Thus, in *Washington Hospital Center v. Group Hospitalization & Medical Services*, 758 F.Supp. 750, 735 n. 2 (D.D.C. 1991), the court held that Congress's silence on the assignability of health benefits indicates that such assignments are not prohibited as a matter of law, "but such silence does not suggest an affirmative policy favoring assignments so strong as to invalidate otherwise valid anti-assignment clauses."

In *Davidowitz v. Delta Dental Plan*, 946 F.2d 1476, 1779 (9th Cir.1991), a group of dentists sought a preliminary injunction requiring that the defendant nonprofit health care plan honor assignment of benefits under the plan. The dentists asserted that ERISA required assignability of benefits, citing *Mackey* and a California case, *Franchise Tax Board v. Construction Laborers Vacation Trust*, 204 Cal.App.3d 955, 251 Cal.Rptr. 597 (1988), in which the court held that ERISA did not preempt a state tax law permitting a levy on benefits of a plan containing a nonassignment clause. The Ninth Circuit found neither case applicable to the issue before it, stating

the garnishment cases cannot be stretched that far. They simply hold that state law may provide a statutory mechanism for judgment collection, and such state procedure is not preempted by ERISA. The *Franchise Tax Board* case noted that voluntary agreement to a nonassignment clause could not displace that un-preempted procedure. Here, the dentists do not rely on a separate statutory right or process that requires voluntary assignments be honored. Thus, the question remains whether ERISA itself mandates assignability, and the garnish-

ment cases provide no assistance in that analysis.

946 F.2d at 1479. The *Davidowitz* court concluded that ERISA did not invalidate the nonassignment clause, finding "that Congress intended *not* to mandate assignability, but intended instead to allow the free marketplace to work out such competitive, cost effective, medical expense reducing structures as might evolve." 946 F.2d at 1481 (emphasis in original).

St. Francis correctly notes that not all of the policies issued by Blue Cross are employee benefit policies. It also notes that some Blue Cross plans may be employee benefit plans but still not fall under ERISA, since, for example, they may have been issued by a government or by a religious institution. 29 U.S.C. § 1003(b).

This does not alter the result, since even as to plans which do not fall within ERISA, St. Francis's claims fail on the merits.

## II. STATE LAW

### A. Constitutional Claims—Standing

■ The court must agree with Blue Cross that St. Francis does not have any standing to assert the specific constitutional claims advanced against Senate Bill No. 66. The constitutionality of a law may not be attacked by a party who invokes not his own but the rights of others. *Manzanares v. Bell,* 214 Kan. 589, 616, 522 P.2d 1291 (1974). *See also City of Kansas City v. Union Pac. Ry.,* 59 Kan. 427, 53 P. 468 (1898), *aff'd,* 176 U.S. 114, 20 S.Ct. 284, 44 L.Ed. 392 (1900).

St. Francis claims standing on the basis of two decisions, *Delight Wholesale v. City of Overland Park,* 203 Kan. 99, 453 P.2d 82 (1969); and *Joe Self Chevrolet v. Board of Sedwick Co. Com'rs,* 247 Kan. 625, 802 P.2d 1231 (1990). In *Delight Wholesale,* the City of Overland Park passed a local ordinance prohibiting all street or sidewalk "huckstering, peddling or similar enterprise." The plaintiff, a franchiser of frozen novelties, brought an action against the city, claiming that the ordinance was an unreasonable exercise of police powers.

The court's discussion of standing is essentially dicta. There is no indication in the opinion that there had been any challenge to the plaintiff's standing. Rather, the court raised the issue of standing only in the context of a lyrical digression by the court. After first noting that the city ordinance would effectively bar all direct sales on the streets of the city, the court observed:

> This would prohibit farmers from selling watermelons, tomatoes and other fresh vegetables from their vehicles. Such sales are about the only opportunity we have to know the difference between a red, juicy watermelon and a sun-kissed tomato all ripened on the vine from those picked green and ripened in the dark recesses of a warehouse. It would also prohibit the old fruit peddler who perhaps is only a nostalgic memory of the past—"Yes, we have no bananas."

203 Kan. at 100, 453 P.2d 82.

Bringing itself back to the case before it, the court then correctly observed that these hypothetical plaintiffs were not before the court. And the court reiterated its general rule of standing, "that the constitutionality of governmental action can only be challenged by a person directly affected and such challenge cannot be made by invoking the rights of others." *Id.* at 101, 453 P.2d 82 (citations omitted). The court did not directly address the issue of the standing of the plaintiff which had brought the lawsuit.

However, even assuming that the Supreme Court had actually considered the question of plaintiff's standing, there are several circumstances present in *Delight Wholesale* which make the case distinguishable from the present controversy. In that case, the plaintiff was challenging the ordinance on the basis of an abuse of the city's police powers, claiming that the ordinance represented "unreasonable or oppressive legislation." *Id.* at 103, 453 P.2d 82. The plaintiff, in seeking to limit the city's police powers to that which is necessary to protect the safety, health, and general welfare of citizens, was thus advocating a right, seeking which inheres in all

citizens. In the present case, on the other hand, St. Francis's claims of special legislation and equal protection essentially raise claims which belong more properly to other insurance companies. When brought by St. Francis, these claims can only be seen as an attempt, as the court in *Delight Wholesale* put it, to "invok[e] the rights of others."

In addition, the city ordinance in that case *directly* affected the plaintiff. The plaintiff company had issued franchises to dealers, who purchased and then resold to the general public various frozen novelties. In addition, these novelties were sold to the public from jeeps which had been leased by the local dealers but which were still owned by the plaintiff company. On the other hand, in the present case, St. Francis is not directly affected by the provision contained in Senate Bill No. 66 permitting Blue Cross to continue to include nonassignment provisions in its policies. Of course, it may be true, as St. Francis argues, that these provisions will ultimately result in an economic loss to the hospital. But this indirect economic impact alone cannot satisfy the requisites for standing.

The second case cited by St. Francis is *Joe Self Chevrolet v. Board of Sedwick Co. Com'rs,* 247 Kan. 625, 802 P.2d 1231 (1990). In that case, Sedwick County, Kansas had seized a truck from George and Janet Hays for delinquent personal property taxes. The county claimed that under K.S.A. 79–2111, the nonpayment of property taxes entitled it both to the seizure of the truck and a preference to the proceeds from its sale. The Hayses subsequently defaulted on their payments on the truck, and the used car dealership which sold them the truck and which retained a security interest in it filed a declaratory judgment action seeking a declaration either that K.S.A. 79–2111 created no such preference in favor of the county, or that the statute was unconstitutional.

The county argued that the car dealer, who was not a party to the tax litigation involving the Hayses, had no standing to determine the constitutionality. The supreme court, after repeating the general rules relating to standing, held that the dealer had the right to file the declaratory judgment action. In doing so, the court first stressed the dealer's continuing property interest in the truck:

> If a seller retains an interest in goods sold to secure payment of some or all of the price, he has a purchase money security interest. The security interest can be perfected by the filing of a financing statement. Joe Self retained an interest in the GMC truck and filed its financing statement. A secured creditor with a lien on the property has a due process right in the property seized. See *Hillhouse v. City of Kansas City,* 221 Kan. 369, 375, 559 P.2d 1148 (1977) (citing *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 40 L.Ed.2d 406, 94 S.Ct. 1895 (1974)).

> Under the facts of this case, [the car dealer], a secured creditor, has sufficient interest in the justiciable controversy to obtain a judicial resolution as to the constitutionality of K.S.A. 79–2111 in a declaratory judgment action.

247 Kan. at 629, 802 P.2d 1231.

■ Unlike the car dealer in *Joe Self,* St. Francis has no continuing property interest which is directly affected by Senate Bill No. 66. Rather, the hospital is only indirectly affected by the continued operation of the nonassignment clauses legitimized by that legislation. To hold that this indirect economic impact was sufficient to challenge the validity of Senate Bill No. 66 under the Kansas Constitution would be inconsistent with the rules of standing which have been set forth by the Kansas courts.

### B. Constitutional Claims

■ St. Francis's constitutional claims also fail on the merits. St. Francis asserts that Senate Bill No. 66 represents special legislation and violation of equal protection. The court must presume the statute is valid. *Guardian Title v. Bell,* 248 Kan. 146, 805 P.2d 33 (1991). Any constitutional infirmity must be clearly demonstrated, and the court must uphold the statute if it is possible to do so. *Kansas Malpractice*

*Victims Coalition v. Bell,* 243 Kan. 333, 340, 757 P.2d 251 (1988).

Article 12, § 1, of the Kansas Constitution provides, "The legislature shall pass no special act conferring corporate powers. Corporations may be created under general laws, but all such laws may be amended or repealed."

Section 1 of the Kansas Bill of Rights provides, "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

■ St. Francis has failed to demonstrate that Senate Bill No. 66 offends either constitutional provision. The act does not create unfair distinctions between existing corporations, nor does it unfairly create separate classification among existing members of one class. Moreover, the act does not create classifications within an existing class of corporation. Rather, Senate Bill No. 66, by its terms, applies to all former nonprofit hospital service companies. It may be that Blue Cross is the only member of that class. That fortuitous circumstance alone does not render the act impermissible special legislation. *See Board of Sedgwick Co. Com'rs v. Robb,* 166 Kan. 122, 199 P.2d 530 (1948), *appeal dismissed,* 336 U.S. 957, 69 S.Ct. 893, 93 L.Ed. 1110 (1949); *State ex rel. Smith v. McCombs,* 129 Kan. 834, 284 P. 618 (1930). Rather, the controlling factor is that the legislation does not unfairly create classifications within the group of former nonprofit hospital service companies.

Nor is there anything in the legislation to suggest that Blue Cross, as it is now constituted, possesses any powers which are not enjoyed by other mutual life insurance companies. That is, there is nothing in the Kansas statutes which bars other insurance companies from including nonassignment clauses in their policies. Whether such clauses are valid in a given case is, of course, a question of whether applicable public policy permits such a clause. That issue is addressed below. The point here is that there is no indication Senate Bill No. 66 does anything other than permit Blue Cross to act as it has for many years by offering policies which include nonassignment clauses. This legislative mandate reflects the legislature's continuing concern with the costs of health care, and reflects a considered and rational attempt to address that problem.

C. Public Policy

■ The core of St. Francis's argument is that the nonassignment clauses contained in the Blue Cross policies violate the Kansas public policy favoring free assignment of choses in action. St. Francis contends that, since the cost control provisions cited by the court in *Augusta Medical Complex v. Blue Cross,* 230 Kan. 361, 634 P.2d 1123 (1981), no longer are directly applicable to Blue Cross in its incarnation as a mutual life insurance company, that decision no longer supports the validity of the nonassignment clauses in the company's policies.

In challenging the validity of the nonassignment clauses, the burden is on St. Francis to demonstrate that the nonassignment clauses do indeed violate public policy. 4 *Corbin on Contracts,* § 872 (1951). In the context of health care insurance, such clauses have been generally upheld as a vital tool in restraining the costs of health care. *Parrish v. Rocky Mountain Hosp. & Med. Serv. Co.,* 754 P.2d 1180 (Colo.App.1988); *Obstetricians–Gynecologists, P.C. v. Blue Cross & Blue Shield,* 219 Neb. 199, 361 N.W.2d 550 (1985); *Kent General Hospital v. Blue Cross & Blue Shield,* 442 A.2d 1368 (Del.Supr.1982).[2]

St. Francis has cited no case from any jurisdiction striking down such nonassignment clauses, when used as part of a strategy for the containment of health care

---

**2.** There are also a number of state trial court decisions which reach the same result. *See Institute of Living v. Blue Cross & Blue Shield,* Case No. CV–90–0382398S, 1991 WL 223871 (Conn.Super. Oct. 4, 1991); *Beebe Hospital v. Blue Cross & Blue Shield,* Case No. 6456, 1981

WL 15133 (Del.Ch., June 26, 1981); *Board of Trustees v. Rocky Mountain Hospital & Medical Service,* Civ. Case No. 81–CV–385 (Wald County Col.Dist.Ct.1981); *Riddle Mem. Hospital v. Blue Cross,* 63 Del.Cty.Rep. 361 (Pa.Common Pleas, 1976).

costs, as a violation of general public policy. Instead, St. Francis relies entirely upon its citation to the decision of the Kansas Supreme Court in *Augusta*. In that case, the court stated:

> Free assignment of choses in action is considered to be a matter of public policy. However, other considerations of public policy may in particular instances compete with and override the desirability of free alienation of choses in action.

230 Kan. at 364, 634 P.2d 1123.

The supreme court in *Augusta*, while noting that free assignment was a good thing, nonetheless found that that policy was counterbalanced by Blue Cross's legislative mandate to achieve controls on the costs of health care. The court at no time suggested or implied that, in the absence of specific statutory authorization for particular cost containment procedures, the policy of free assignment must control. Rather, the language of the opinion indicates that while free assignment may be desirable generally, there may still be "other considerations of public policy" which support the validity of nonassignability clauses, beyond even the absence of specific statutory authorization for cost containment.

The court does not believe that free assignment of choses in action is so compelling a public policy that the nonassignment clauses contained in the Blue Cross policies are void.

▪ First, there is a countervailing policy which balances free assignment of choses in action: the freedom to contract. Kansas courts have repeatedly recognized that the freedom to contract is an important public policy. State "public policy encourages the freedom to contract, which should not be interfered with lightly." *Miller v. Foulston, Siefkin*, 246 Kan. 450, 790 P.2d 404, 413 (1990). Absent a specific finding of unconscionability, a party is bound by an agreement fairly and voluntarily entered into, notwithstanding it was unwise or disadvantageous to him. *Corral v. Rollins Protective Services*, 240 Kan. 678, 732 P.2d 1260 (1987).

Other courts which have addressed similar situations have also stressed the importance of freedom to contract as a counterbalance to the policy of free assignment. The Colorado Court of Appeals has noted that "the policy of free alienability of choses in action can be overcome by the strong policy of freedom of contract." *Parrish v. Rocky Mountain Hosp.*, 754 P.2d 1180, 1182 (1988). In *Obstetricians–Gynecologists*, the Nebraska Supreme Court observed:

> While this policy [of free assignability] is significant and may reflect a public policy, it is not paramount and must be balanced against a very strong policy, recognized in many cases in Nebraska and in authoritative texts, favoring the freedom to contract.

361 N.W.2d at 555.

▪ How important is the public policy supporting the free assignment of choses in action? St. Francis has failed to identify any particular compelling nature in that general public policy. And, while Kansas cases have recognized that public policy supports the free assignment of choses in action, *Augusta*, 230 Kan. at 364, 634 P.2d 1123, no decision has ever attempted to quantify the strength of this public policy. Indeed, the court in *Augusta*, while recognizing the general existence of the policy, at most merely documented its existence. It did not sing any paeans to the importance of the policy. The court has found no decision which characterizes the policy as particularly compelling. Rather, at most the case law indicates that assignments of choses in action "are recognized and enforced;" *Commodore v. Armour & Co.*, 201 Kan. 412, 418, 441 P.2d 815 (1968), indicating simply that such assignments are permitted rather than preferred.

▪ At one time, Kansas had a specific statute legitimizing the assignment of choses in action. G.S. (1949) 60–401 expressly affirmed the legality of such assignments. That statute has since been repealed. Another statute, K.S.A. 40–440, acknowledges the existing right to assign interests under an insurance policy. But, like the *Commodore* decision, this merely affirms the validity of such assignments in general; it does

not guarantee the universal right to assign benefits by voiding contractual agreements limiting the scope of assignment.[3] Moreover, the state legislature has explicitly recognized that the policy of favoring free assignability is not always superior to other interests by prohibiting by statute assignability in certain cases. *See* K.S.A. 16a–3–305 (limiting assignment of wages); K.S.A. 44–514 (prohibiting assignment of workers compensation benefits).

Thus, while the free assignment of choses in action may be a valuable and important goal of public policy, it is not superior to competing public interests. The policy supporting free alienability is not "such an absolute one that it must override a contract provision prohibiting assignment in a specific context." *Kent*, 442 A.2d at 13. As one commentator has observed,

> There is no sufficient analogy between chattels and "choses in action" on which to rest the conclusion that contract rights, once inalienable at common law, must now of necessity be alienable even though the contract by which they are created says that they are not. In all cases, assignees are held to take the assigned right with all its native weaknesses and subject to many defenses.

4 *Corbin on Contracts* § 873, p. 488.

The public policy supporting free assignment is not, therefore, an unqualified one. Against that policy must be set the competing policy of freedom of contract. But there is also a third policy which must also be considered: the policy of attempting to restrain the growth of health care costs. That policy and that need have been recognized by the legislature and the courts of Kansas.

It may be noted first that although the cost control provisions contained in Articles 18 and 19c of Chapter 40 no longer directly apply to Blue Cross, those provisions re-

main in effect. The legislature could have repealed those provisions but it chose not to do so, indicating that cost control in the health services industry remains a concern in Kansas.

That concern, moreover, has been repeatedly emphasized by the legislature. The control of the explosion of health care costs has formed a recurrent theme in recent legislation. Under K.S.A. 65–4915(a)(3)(F), the legislature has encouraged the use of peer review programs which serve to "establish and enforce guidelines designed to keep within reason the cost of health care." Under K.S.A. 65–4804, the construction of new health care facilities is made dependent upon the certification of need, which must take into account cost containment, defined as "lowering, or restricting the increase, of health care costs to the consuming public." Maximum fee schedules for health care services under the state Workers Compensation Act have been imposed which are explicitly required to "promote health care cost containment and efficiency." K.S.A. 44–510(a)(2). The legislature has required that, prior to the consideration of any legislation providing for mandated health benefits, the party sponsoring such legislation must report the effect of its proposals on the total costs of health care. K.S.A. 40–2249(b)(5). Finally, the legislature has recently created the Kansas Commission on the Future of Health Care, Inc. K.S.A. 74–9401 *et seq.* One of the express purposes of this corporation is the formation of task forces to study ways to control health care costs. K.S.A. 74–9403(a)(8).

This public interest has also been recognized by the Kansas Supreme Court, which recognized in *Augusta* that the Blue Cross provider agreement system had been adopted out of a concern for "spiraling hospital service costs" 230 Kan. at 361, 634 P.2d 1123. "The concern over skyrocket-

---

**3.** The situation in Kansas can thus be contrasted with a state such as Arkansas, which provides by statute that:

> All bonds, bills, notes, agreements, and contracts, in writing, for the payment of money or property, or for both money and property, *shall be assignable.*

Ark.Code Ann. § 4–58–102 (1987) (emphasis added). The mandatory nature of this statute underlies the only reported decision striking down nonassignment clauses in the context of a system designed to limit the growth of health care costs, *American Medical Internat'l v. Arkansas Blue Cross & Blue Shield*, 299 Ark. 514, 773 S.W.2d 831 (1989).

ing health care costs is real and nationwide," the court wrote in *Augusta,* concluding explicitly that the control of those costs "is a matter of vital public interest." 230 Kan. at 364–65, 634 P.2d 1123. There is utterly no indication that this public interest has ceased to exist. If anything, it is more acute now than ever.

Courts have repeatedly found such provider agreements to be important tools of the vital public policy of limiting the growth of health care costs. *Washington Hospital Center,* 758 F.Supp. at 754 (noting that it was "easy to see how health costs" are restrained under such a system). In *Obstetrician–Gynecologists,* 361 N.W.2d at 556, the Nebraska Supreme Court noted Blue Cross's evidence that such a nonassignment clause was a "valuable tool" in holding down hospital costs, and concluded that the policy of allowing such clauses "indicates a far stronger public policy" than the generalized support for free assignability.

The mere fact that there is not express authority for cost controls by mutual insurance companies should not be taken as a sign that the nonassignment clauses in the Blue Cross policies do not fulfill a public policy role. Thus, the court upheld the use of such clauses in *Obstetricians–Gynecologists* as a reflection of the general policy of restraining health care costs, even though the court acknowledged that the statutory authorization for cost containment was much more general than that existing in Kansas at the time of *Augusta.* 361 N.W.2d at 556. The Delaware Supreme Court reached the same result in *Kent,* though again noting that the policy favoring the cost restraint was only general in nature. 442 A.2d at 1372.

Finally, it is important to note the contradiction underlying the argument of St. Francis. St. Francis argues on the one hand that Blue Cross is no longer entitled to the public policy balancing performed in *Augusta* since Blue Cross no longer enjoys any special "mandate" for controlling health care costs under Article 18 of Chapter 40. Yet, on the other hand, St. Francis also argues that the legislature's express decision via Chapter 195 to allow Blue Cross to continue the use of nonassignment clauses is invalid because it is special legislation. Far from serving as special legislation, Senate Bill No. 66, in fact, serves as a continuing expression of legislative concern for the rising cost of health care in Kansas. That is, just as the provisions in Article 18 were taken in *Augusta* as evidence of legislative intent to control costs, this is also the intent of Senate Bill No. 66.

Thus, the policy of free assignability is counterbalanced by freedom of contract. Nonassignment clauses, as used in the Blue Cross policies challenged herein, are valid and freely made contracts. Moreover, the validity of such clauses is also supported by the compelling public policy of controlling the growth of health care costs. This policy has been supported by both the state legislature and the courts. It is also reflected in Senate Bill No. 66 specifically. Thus, nonassignability is not a violation of public policy.

St. Francis's claims fail on the merits. And thus its request for injunctive relief also must fail, since a decision against it on the merits necessarily reflects a determination that St. Francis is not likely to win on the merits. Accordingly, the court finds that it is unnecessary to address St. Francis's motion for a preliminary injunction.

IT IS ACCORDINGLY ORDERED this 30th day of December, 1992, that defendant Blue Cross's motion to dismiss (Dkt. No. 6) is hereby granted.