**PARRISH CHIROPRACTIC CENTERS, P.C., Petitioner,**

v.

**PROGRESSIVE CASUALTY INSURANCE COMPANY, Respondent.**

No. 93SC302.

Supreme Court of Colorado, En Banc.

May 16, 1994.

Ozer, Sokolow & Mullen, P.C., Robert C. Ozer, Renee C. Ozer, Colorado Springs, for petitioner.

White & Steele, P.C., Frederick W. Klann, George A. Codding, III, Denver, for respondent.

James D. King & Associates, P.C., James D. King, Richard S. Hays, Denver, for amicus curiae Provenant Health Partners.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the opinion of the court of appeals in *Parrish Chiropractic Centers, P.C. v. Progressive Casualty Ins. Co.*, 857 P.2d 540 (Colo.App.1993) (*Parrish I* ). In that opinion, the court of appeals held that a clause in an insurance policy prohibiting the assignment of an "interest in the policy" can be invoked to prohibit the assignment of payment directly to a health-care provider after a loss has occurred. *Id.* at 541. It further held that a private provider of chiropractic services which provided treatment to a patient insured under a No-Fault policy is not a third-party beneficiary of the No-Fault policy and thus is not entitled to recover in a direct action to enforce the terms of that policy. *Id.* at 542. For the reasons stated below, we affirm.

## I

The facts relevant to our disposition of this action are not in dispute. Defendant-respondent Progressive Casualty Insurance Company (Progressive) issues insurance policies pursuant to the Colorado Auto Accident Reparations Act (No-Fault Act), §§ 10–4–701 to –725, 4A C.R.S. (1987 & 1993 Supp.), to provide personal injury protection (PIP) benefits to persons injured in automobile accidents. Each PIP policy issued by Progressive contains a provision stating: "Interest in this policy may not be assigned without *our* written consent." (Emphasis in original.)

Plaintiff-petitioner Parrish Chiropractic Centers, P.C. (Parrish) provides treatment to many patients who hold PIP policies issued by Progressive and who have been injured in automobile accidents. When patients come to Parrish for treatment, they are required to execute an agreement with Parrish entitled "Assignment, Lien, Release and Power of Attorney" prior to receiving any chiropractic treatment.[1] In that agreement, patients purport to assign to Parrish their right to

---

1. This pre-printed agreement reads in relevant part as follows:

**ASSIGNMENT, LIEN, RELEASE AND POWER OF ATTORNEY**

....

A. Patient assigns to [Parrish] any and all benefits payable by Patient's insurance or health care plan(s) as a result of charges incurred by Patient for services rendered by [Parrish]. Patient also assigns to [Parrish] any and all contractual rights Patient has against any insurance company, health care benefit plan, or any other party contractually liable to Patient for payment of health care costs incurred by Patient as a result of services rendered by [Parrish]....

....

D. Patient hereby directs all insurers and other persons responsible for Patient's health care costs to make all payments for health care services rendered by [Parrish] directly to [Parrish].

E. Patient hereby appoints [Parrish] as Patient's true and lawful attorney, irrevocable, and with full power of substitution, for Patient and in Patient's name, to ask, demand, sue for, collect, endorse, sign and receive proceeds from insurance, other health benefits, and third party claims relating to services rendered to Patient by [Parrish]....

F. Patient agrees that in the event Patient receives any check, draft or other payment subject to this Agreement, Patient agrees to act as fiduciary agent for [Parrish] and will immediately deliver said check, draft or payment to [Parrish]....

....

This [sic] assignments and agreements contained in this document may not be revoked by Patient without the express written consent of [Parrish]....

receive benefits under their respective PIP policies.

Until recently, Progressive routinely honored such assignments by paying benefits under its PIP policies directly to Parrish. This case arose as a result of Progressive's decision to begin paying PIP benefits, as a matter of policy, directly to its insureds who received treatment from Parrish, rather than honoring Parrish's requests for payment.[2] The reason cited by Progressive for its change in payment policy is the fact that

> according to experience and economic studies, treatment with Parrish took considerably longer and was considerably more expensive on the average than with other chiropractors, and because allowing an assignment diminished the insurer's and insured's ability to control the frequency and costs of treatment and increased Progressive's administrative costs in dealing with the provider as well as the insured.

After Progressive refused a request from Parrish for payment for treatment rendered to several of Progressive's insureds, Parrish brought this action to recover its unreimbursed chiropractic fees. Parrish alleged that although Progressive did pay out PIP benefits directly to the insureds in question, those individuals did not apply the benefits to their chiropractic bills. Parrish claimed, *inter alia*, that the assignment of rights executed by its patients entitled it to direct payment from Progressive. Parrish also sought payment from Progressive under the theory that it was a third-party beneficiary to the PIP contracts between its patients and Progressive.[3]

Progressive denied all claims, arguing that the purported assignments of benefits violated the express terms of its standard PIP policy and, consequently, were void *ab initio*. Progressive also contended that Parrish was not an intended third-party beneficiary of

such policies but rather merely received an unintentional, incidental advantage from the policy.

The trial court agreed with Progressive and granted its motion for partial summary judgment.[4] It concluded that the assignments to Parrish were invalid as a matter of law in light of the express provision in Progressive's policies prohibiting assignment of any "interest in the policy" without its consent. The trial court further found that recognition of such assignments by the patients/insureds would "materially change Progressive's obligation under the insurance contracts." Finally, it found that Parrish was not a third-party beneficiary of the insurance contract between Progressive and its insureds because the policies contain "absolutely no expression of intent to confer any benefit upon Parrish." The court of appeals affirmed the trial court's judgment. *Parrish I*, 857 P.2d at 542.

## II

Contract rights generally are assignable, except where assignment is prohibited by contract or by operation of law or where the contract involves a matter of personal trust or confidence. *Matson v. White*, 122 Colo. 79, 83–84, 220 P.2d 864, 867 (1950); *Scott v. Fox Bros. Enterprises, Inc.*, 667 P.2d 773, 774 (Colo.App.1983). Where the contract in question specifically prohibits the assignment of rights or interests under the contract without the consent of one or more of the contracting parties, any purported assignment without such consent will not be enforced. 16 George J. Couch, *Couch on Insurance 2d* § 63:159 (1983) ("If the insurer's consent is essential to the validity of an assignment, an assignee acquires no right in the absence of such consent."); 2A John Appleman & Jean Appleman, *Insurance Law and Practice* § 1193 (1966) (same); *accord*

---

**2.** It is not clear from the record whether Progressive adopted this new policy with respect to those insureds who received treatment from health care providers other than Parrish.

**3.** In its briefs to this court, Parrish indicated that it had "agreed to waive any claim that Progressive was estopped from refusing to honor the

assignments of benefits because of its prior pattern of paying Parrish directly after receiving assignments."

**4.** The parties stipulated that there were no genuine issues of material fact in dispute which would preclude the trial court from ruling on their cross-motions for summary judgment.

*Paul v. Chromalytics Corp.,* 343 A.2d 622, 626 (Del.Super.Ct.1975).

■■■ A distinction traditionally has been made, however, between an assignment of an insurance policy *before* a loss has occurred and the assignment of the benefits due to the insured *after* a loss.[5] 16 *Couch on Insurance 2d* §§ 63:2, 63:40 (1983 & 1993 Supp.) (collecting cases); 6B *Appleman* § 4269 (1979 & 1993 Supp.) (collecting cases). Non-assignment clauses are strictly enforced against attempted *pre*-loss transfers of the policy itself, because assignments before loss involve a transfer of a contractual relationship and, in most cases, would materially increase the risk to the insurer. 16 *Couch on Insurance 2d* § 63:40; *see, e.g., Zimbelman v. Hartford Fire Ins. Co.,* 92 Colo. 536, 542–44, 22 P.2d 866, 868–69 (1933); *Smith v. Buege,* 182 W.Va. 204, 387 S.E.2d 109, 116 (1989). By contrast, assignments of *post*-loss benefits are usually found to be valid regardless of any non-assignment clause in the policy. *See, e.g., Metropolitan Life Ins. Co. v. Lanigan,* 74 Colo. 386, 388, 222 P. 402, 403 (1924); *Lain v. Metropolitan Life Ins. Co.,* 388 Ill. 576, 58 N.E.2d 587, 588 (1944). This rule is explained by the fact that (1) post-loss assignments of the benefits due under the policy are viewed as transfers of a chose in action and public policy favors the free alienability of choses in action, and (2) such assignments would not materially increase the insurer's risk or obligation under the policy. *See Kent General Hosp., Inc. v. Blue Cross & Blue Shield of Delaware, Inc.,* 442 A.2d 1368, 1370 (Del.1982); *Santiago v. Safeway Ins. Co.,* 196 Ga.App. 480, 396 S.E.2d 506, 508 (1990), *cert. denied* (Oct. 18, 1990).

■■ Having set forth the general rules regarding non-assignment clauses in insurance policies, we now turn to an important exception to those rules.` In recent years, several courts have concluded that non-assignment clauses in group health care contracts are enforceable against post-loss assignments to health care providers of the insured's right to receive benefits under the policy. *See Parrish v. Rocky Mountain Hosp. & Med. Services Co.,* 754 P.2d 1180, 1182 (Colo.App.1988); *St. Francis Regional Med. Center v. Blue Cross Blue Shield of Kansas,* 810 F.Supp. 1209 (D.Kan.1992); *Institute of Living v. Blue Cross & Blue Shield,* No. CV–90–0382398S, 1991 WL 223871 (Conn.Super.Ct. Oct. 4, 1991); *Kent General Hosp., Inc. v. Blue Cross & Blue Shield of Delaware, Inc.,* 442 A.2d 1368 (Del. 1982); *Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc.,* 230 Kan. 361, 634 P.2d 1123 (1981); *Obstetricians–Gynecologists, P.C. v. Blue Cross & Blue Shield of Nebraska, Inc.,* 219 Neb. 199, 361 N.W.2d 550 (1985); *Riddle Memorial Hosp. v. Blue Cross of Greater Philadelphia,* 63 Del.Cty. Rep. 361 (Pa.Common Pleas 1976); *cf. Davidowitz v. Delta Dental Plan of Cal., Inc.,* 946 F.2d 1476, 1478–81 (9th Cir.1991) (holding that ERISA welfare payments are not assignable in the face of a non-assignment clause in the health benefit plan); *Washington Hosp. Center Corp. v. Group Hospitalization and Med. Services, Inc.,* 758 F.Supp. 750, 753–55 (D.D.C.1991) (same); *but see American Med. Int'l v. Arkansas Blue Cross & Blue Shield,* 299 Ark. 514, 773 S.W.2d 831 (1989) (striking down non-assignment clause in group health care policy in view of statute which states that "all contracts, in writing, for the payment of money or property, or for both money and property, *shall be assignable* ") (emphasis added). The cases upholding non-assignment clauses conclude that the "strong policy of freedom of contract" and the fact that non-assignment clauses "are valuable tools in persuading health care providers to keep their health care costs down" override the general policy favoring the free alienability of choses in action. *Rocky Mountain Hosp.,* 754 P.2d at 1182; *see also St. Francis,* 810 F.Supp. at 1218–20; *Kent General,* 442 A.2d at 1371–72; *Obstetricians–Gynecologists,* 361 N.W.2d at 555–56. Accordingly, purported assignments of benefits

---

**5.** We agree with Parrish that the "loss" in this case refers to the injury suffered by the insured for which he or she was covered under the PIP policy, and not to the actual rendering of medical services. *See Loyola Univ. Med. Center v. Med. Care HMO,* 180 Ill.App.3d 471, 129 Ill.Dec. 360, 364 & 364 n. 2, 535 N.E.2d 1125, 1129 & 1129 n. 2 (1989) ("The medical condition or injury necessitating treatment is the 'loss,' which is sustained by the insured and no other persons."). Thus, the purported assignments in this case were executed after a loss had occurred.

to a health care provider, in the face of a non-assignment clause in a group health care policy, are considered to be void and unenforceable against the insurer.

Parrish contends that this line of cases is inapplicable to the case before us because those decisions only address insurance policies issued by non-profit health services corporations (i.e., Blue Cross/Blue Shield entities). Unlike private insurers, health service corporations rely on non-assignment clauses as an important inducement to hospitals to participate in their group insurance networks.[6] *See, e.g., Kent General,* 442 A.2d at 1371; *Augusta Medical,* 634 P.2d at 1126. Because their ability to provide affordable health care coverage is directly related to the number of hospitals participating in their group plans, health services corporations provide a compelling reason for enforcing non-assignment clauses against purported post-loss transfers of policy benefits.[7] According to Parrish, the Blue Cross/Blue Shield cases are thus factually unique and not relevant to our decision in this case. We disagree.

The "participation inducement" rationale described above is neither the only, nor the primary, reason cited in the Blue Cross/Blue Shield cases to support enforcement of non-assignment clauses as against attempted post-loss assignments. Rather, those decisions are grounded on a broader principle— that the public policy in favor of the freedom of contract, and the corollary right of the insurer to deal only with the party with whom it contracted, outweigh the general policy favoring the free alienability of choses in action. *See, e.g., Rocky Mountain Hosp.,* 754 P.2d at 1182; *St. Francis,* 810 F.Supp. at 1218–20; *Kent General,* 442 A.2d at 1372; *Obstetricians–Gynecologists,* 361 N.W.2d at 555–56; *see also* 14 Samuel J. Williston, *A Treatise on the Law of Contracts* § 1630 (3d ed. 1972). "Thus, while the free assignment of choses in action may be a valuable and important goal of public policy, it is not superior to competing public interests. The policy supporting free alienability is not 'such an absolute one that it must override a contract provision prohibiting assignment in a specific

**6.** In *Washington Hosp.,* 758 F.Supp. at 754, the district court explained:

> It is easy to see how health costs might be constrained by a contract, such as the one between Blue Cross and Washington Hospital, in which the hospital agrees to ceilings on the amount charged patients under the Blue Cross plan, agrees to accept payment by Blue Cross as full payment without billing the patient for any balance, and submits to other cost constraints. Patients under such group policies are given a strong incentive to utilize participating hospitals, where the insurer will pay for the entire cost of covered services ... instead of the lesser reimbursement available for use of non-participating hospitals. The participating hospital gets the benefit of increased flow of patients, and rapid, certain and direct payments from the insurer. The insurer can attract subscribers with the promise of 100 percent coverage and, at the same time, can reduce its costs through the reimbursement schedule and any other cost constraints accepted by the participating hospital.
>
> This mechanism depends on the willingness of hospitals to participate by subjecting themselves to the constraints already described. A hospital would have far less reason to participate if non-participating hospitals could garner the same advantages without subjecting themselves to the constraints. Under the contracts between insurer and the participating hospital, the participating hospital may recover the hos-

> pital charges directly from the insurer without the delay and risk involved in seeking the reimbursement from patients. *If a patient could obtain care from a non-participating hospital and assign it the patient's right to be reimbursed under a group policy, in the teeth of an anti-assignment clause, this direct payment inducement to become a participating hospital would be weakened or eliminated.*

(Emphasis added.)

**7.** Progressive claims that this rationale also applies to private insurers and asserts that its right to control costs under the contract would be severely limited if it were not able to prevent insureds from assigning their right to receive benefits prior to treatment. According to this view, although a "loss" has occurred, the precise amount and extent of the insurer's liability for that "loss" under the PIP policy is not defined prior to treatment. Progressive claims that because it has reason to believe that Parrish routinely overbills its patients, enforcement of post-loss assignments of benefits to Parrish prior to treatment would decrease materially the value of its contract with the insured. Even if we assume, however, that Parrish has in the past charged more than its competitors, Progressive may refuse to pay for any treatment performed by Parrish which is not "reasonable and necessary," § 10–4–706(1)(b), 4A C.R.S. (1987), regardless of whether it is Parrish or its insured who is claiming benefits under the contract.

context.'" St. Francis, 810 F.Supp. at 1219 (quoting Kent General, 442 A.2d at 1371). To hold otherwise would be to force Progressive to deal with parties with whom it has not contracted, regardless of the fact that its policy contains an express contractual provision requiring its prior consent to any assignment of interests in the policy. See Kent General, 442 A.2d at 1372; Obstetricians–Gynecologists, 361 N.W.2d at 555. The public policy of this state does not dictate such a result.[8]

Accordingly, we reject Parrish's argument that a non-assignment clause in an insurance policy is unenforceable as a matter of law against post-loss assignments of policy benefits.[9]

### III

Parrish contends that even if non-assignment clauses may be enforced in some circumstances to prevent post-loss assignments, the non-assignment clause in the Progressive PIP policy is ambiguous and therefore should be construed against Progressive. See Simon v. Shelter Gen. Ins. Co., 842 P.2d 236, 239 (Colo.1992). Once again, we disagree.

Insurance contracts are construed in accordance with the general law of contracts. F.D.I.C. v. American Cas. Co. of Reading, Pa., 843 P.2d 1285, 1289–90 (Colo. 1992). Where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself. Matter of May, 756 P.2d 362, 369 (Colo.1988).

When a contractual provision is clear and unambiguous, courts should neither rewrite it nor limit its effect by a strained construction. Id. 843 P.2d at 1290. However, where there is ambiguity or uncertainty as to coverage, courts should construe the policy in favor of the insured. Republic Ins. Co. v. Jernigan, 753 P.2d 229, 232 (Colo.1988); accord F.D.I.C. v. American Cas., 843 P.2d at 1290; Chacon v. American Family Mut. Ins. Co., 788 P.2d 748, 750 (Colo.1990).

A provision in a policy is ambiguous when it is reasonably susceptible, on its face, to more than one meaning. Northern Ins. Co. v. Ekstrom, 784 P.2d 320, 323 (Colo. 1989). In order to ascertain whether a provision is ambiguous, a court must examine and construe the language in harmony with the plain and generally accepted meaning of the words employed. Wota v. Blue Cross & Blue Shield, 831 P.2d 1307, 1309 (Colo.1992); Heller v. Fire Ins. Exch., 800 P.2d 1006, 1008 (Colo.1990). Mere disagreement between the litigating parties about the meaning of a contract term does not serve to create an ambiguity. Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371, 374 (Colo.1990).

Parrish claims that the phrase "[i]nterest in this policy" is ambiguous because reasonable persons would not interpret it to mean "all interests under the policy," but rather would understand the phrase to refer only to "coverage under the policy prior to loss." To support this view, Parrish cites the fact that prior to the Blue Cross/Blue Shield cases discussed supra, non-assignment clauses in

---

**8.** Our prior decision in Metropolitan Life Ins. Co. v. Lanigan, 74 Colo. 386, 222 P. 402 (1924), does not hold otherwise. In that case, we refused to enforce a "void if assigned" clause in a life insurance contract where to do so would have violated public policy by causing a forfeiture of insurance coverage. Id. at 387–88, 222 P. at 402–03; see also National American Ins. Co. v. Jamison Agency, Inc., 501 F.2d 1125, 1128–29 (8th Cir.1974) (same). By contrast, enforcement of the non-assignment clause would not cause any forfeiture of insurance coverage in this case since it is undisputed that Progressive has paid out PIP benefits directly to its insureds.

**9.** We recognize that our decision in the present case has limited precedential value in light of a recent amendment to the No–Fault Act which states that

A policy of motor vehicle insurance which provides coverage pursuant to [the No–Fault Act] shall allow, but not require, an insured under the policy to assign, in writing, payments due under the policy to a licensed hospital or other licensed health care provider for services provided to the insured which are covered under the policy.

§ 10–4–708.4(1)(a), 4A C.R.S. (1993 Supp.). This section became effective January 1, 1994 and applies to all policies in force on that date, all policies issued on or after that date, and all treatment rendered on or after that date for which an assignment exists. See Ch. 184, sec. 2, § 10–4–708.5, 1993 Colo.Sess.Laws 725, 726. It is undisputed that the provisions of section 10–4–708.4 do not apply to this case.

general were interpreted as inapplicable to post-loss transfers of the right to payment under the policy.

This argument ignores the fact that the ambiguity must first be shown to exist on the face of the contract. The term "interest" cannot be said to be susceptible on its face to the technical interpretation offered by Parrish. "Interest" is defined as "the most general term that can be employed to denote a right, claim, title or legal share in something." *Black's Law Dictionary* 729 (5th ed. 1979); *see also Webster's New World Dictionary* 703 (3d ed. 1989) (defining "interest" as "a right or claim to something"). It is clear that the term "interest" is broad enough to include policy benefits assigned after a loss. The real issue raised by Parrish is not whether the non-assignment clause is ambiguous on its face, but rather whether courts would *enforce* the non-assignment clause to prevent post-loss assignments of policy benefits in light of the competing public policies implicated by such a contractual term. Because the existence of a dispute between the parties as to the legal effect of a contract term does not render the policy ambiguous, *Fibreglas,* 799 P.2d at 375, we reject Parrish's claim in this regard.

## IV

 Parrish's final claim is that it is an intended third-party beneficiary of the PIP insurance contract between Progressive and those of Progressive's insureds who sought treatment from Parrish. This argument is without merit.

 A person not a party to an express contract may bring an action on the contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract. *E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.,* 704 P.2d 859, 865 (Colo.1985). While the intent to benefit the non-party need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both. *Id.*

In this case, Parrish was only one of many health care providers from which Progressive's insureds could have chosen for treatment of injuries resulting from automobile accidents covered by that policy. *See Kelly Health Care, Inc. v. Prudential Ins. Co. of America, Inc.,* 226 Va. 376, 309 S.E.2d 305, 307 (1983) (holding that "member of a large class of health care providers" available to the insured was only a "potential and incidental" beneficiary of the contract and thus not entitled to recover thereunder). Parrish argues that it is nevertheless an intended beneficiary of the PIP policy because of this court's decision in *United States v. Criterion Ins. Co.,* 198 Colo. 132, 596 P.2d 1203 (1979).

In *Criterion,* we decided a question certified by the federal appellate court as to whether the United States could recover from a private insurer as a third-party beneficiary under the No–Fault Act for medical treatment provided by it to a national guardsman injured while on active duty and whose injury was covered under a policy with that insurer. We answered the question in the affirmative, basing our decision on the fact that the United States was statutorily required to provide the medical coverage in question and that it would be inequitable to permit the insurer to avoid its contractual liability simply due to the fortuity that its insured was a member of the armed forces and thus permitted to seek medical care from the United States. We specifically limited our holding to the facts of that case. *Id.* at 133, 596 P.2d at 1205 ("We conclude that it was the legislative intent that the provider be a third party beneficiary *in a situation such as this before us.*") (emphasis added).

Here, Parrish was not obliged under any statutory scheme to provide medical treatment to Progressive's insureds. Rather, it was merely one of numerous private providers of chiropractic services from which Progressive's insureds could have received treatment. Thus, unlike in *Criterion,* Parrish can cite no intent on the part of the legislature to create a third-party beneficiary relationship under these facts. Accordingly, we agree with both the trial court and the court of appeals that Parrish is only an incidental beneficiary of the Progressive PIP policy

and, as such, is not entitled to recovery in a direct action to enforce the terms of that policy.

The judgment of the court of appeals is affirmed.

Justice LOHR concurs in part and dissents in part, and Justice KIRSHBAUM joins in the concurrence and dissent.

Justice LOHR concurring in part and dissenting in part:

The majority affirms the Colorado Court of Appeals' judgment affirming the district court's summary judgment entered in favor of Progressive Casualty Insurance Company (Progressive). Maj. op. at 1056. Although I agree with the majority's analysis and conclusions in parts II and IV of its opinion, I disagree with the conclusions in part three. I would therefore reverse the judgment of the court of appeals and remand the case to that court with directions to reverse the judgment of the district court and return the case to that court for further proceedings. Accordingly, I respectfully concur in part and dissent in part.

The majority adequately sets forth the facts of the case. In part II of its opinion, the majority rejects the argument that a non-assignment clause in an insurance policy is unenforceable as a matter of law against post-loss assignments of policy benefits. Maj. op. at 1055. I also agree with the majority's determination on this issue. I also agree with the majority's conclusion, in part IV of the opinion, that Parrish is not a third-party beneficiary of the Progressive PIP policy (the policy). Maj. op. at 1056. However, I disagree with the majority's conclusion in part III that the policy is unambiguous. Maj. op. at 1056.

Terms in an insurance policy are ambiguous if they are susceptible to more than one reasonable interpretation. *National Casualty Co. v. Great Southwest Fire Ins. Co.*, 833 P.2d 741, 746 (Colo.1992); *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1091 (Colo.1991). When terms of a contract are ambiguous, they must be strictly construed against the party drafting the contract. *United States Fidelity & Guar. Co. v.*

*Budget Rent–A–Car Systems, Inc.*, 842 P.2d 208, 211 (Colo.1992); *Green Shoe Mfg. Co. v. Farber*, 712 P.2d 1014, 1016 (Colo.1986). When interpreting the language of an insurance contract, "its provisions cannot be read in isolation, but must be considered as a whole." *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 239 (Colo.1992); *accord Wota v. Blue Cross and Blue Shield*, 831 P.2d 1307, 1309 (Colo.1992).

In the present case, the policy contains the following provision:

**ASSIGNMENT**

Interest in this policy may not be assigned without *our* written consent. If the Policyholder named in the Declarations or the spouse of the Policyholder resident in the same household dies, the policy will cover:

 a. the survivor;

 b. the legal representative of the deceased person while acting within the scope of duty of a legal representative; and

 c. any person having proper custody of *your insured car* until a legal representative is appointed, but in no event, for more than 30 days after the date of such death.

(Emphasis in original.)

Relying only on the first sentence of this provision, the majority reasons that the policy unambiguously prohibits assignment of policy benefits after a loss. Maj. op. at 1055–1056. When the provision is considered as a whole, however, the meaning of the first sentence becomes ambiguous. With the exception of the first sentence, all of the language of the provision concerns the *coverage* of the policy. That is, the language specifies who is *covered* by the policy in the event that the policyholder or the policyholder's spouse should die. Considered in relation to the whole provision, the first sentence can reasonably be construed as referring only to the non-assignability of coverage under the policy. Under such a construction, the provision would preclude, for example, a policyholder from assigning his policy coverage along with the sale of his used car. As a result, the provision is amenable to more than one reasonable interpretation as to whether it pre-

cludes assignments of post-loss *benefits*. In this regard, the provision is ambiguous at best.

Under the rules of construction discussed above, therefore, I would construe the provision against Progressive, the drafter of the contract. Applying the principles of assignability set forth in part II of the majority opinion, I would construe the provision to permit the assignment of post-loss benefits. Consequently, I would reverse the judgment of the court of appeals and remand the case to that court with directions to reverse the judgment of the district court and return the case to that court for further proceedings.

Accordingly, I respectfully concur in part and dissent in part.

Justice KIRSHBAUM joins in this concurrence and dissent.