**MONROE PROPERTY, LLC, a Nevada limited liability company, Plaintiff,**

v.

**BACHELOR GULCH RESORT, LLC, a Colorado limited liability company, Vail Resorts Development Company, a Colorado corporation, and Ritz–Carlton Hotel Company, LLC, a Delaware limited liability corporation, Defendants.**

No. 02–CV–1479–JLK.

United States District Court, D. Colorado.

June 6, 2005.

Dean Arthur Dickie, Daniel M. Noland, Rooks, Pitts, Chicago, IL, for Plaintiff.

Kenneth Kent Skogg, Lowe, Fell & Skogg, LLC, Denver, CO, for Defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

KANE, Senior District Judge.

This action arises out of Plaintiff's termination before closing of an agreement to purchase a $5.75 million penthouse condominium unit in Vail, Colorado, and the resulting retention by Defendants of Plaintiff's $866,000 earnest money deposit. The action is before me on cross-motions for summary judgment. I grant Defendants' Motion in part and deny it in part. I deny Plaintiff's Motion for Summary Judgment in its entirety.

### Facts and Procedural History.

The facts relevant to this dispute are as follows:

Plaintiff, Monroe Properties LLC ("Monroe"), is a Las Vegas company whose principal is David Lipson. When an opportunity arose to invest in a hotel and penthouse residence development known as Bachelor Gulch Village Resort in Vail, Colorado, Lipson took it and entered into a Condominium Unit Construction, Purchase and Sale Agreement for Bachelor Gulch Village Resort and Spa Condominiums with Defendant Bachelor Gulch Resort LLC (the "Agreement"). With certain exceptions, the Agreement anticipated a completion date for construction and clos-

ing within two years of its effective date. The Agreement allowed for the assignment of rights under the contract by the buyer, but only with the seller's consent. The effective date of the Agreement was December 22, 1999.

In May 2000, Bachelor Gulch representative James Mandel wrote Lipson seeking an amended effective date of June 1, 2000 to accommodate certain delays in finalizing financing arrangements. Mandel asked Lipson to sign and return the letter if he agreed to the extension, and warned that if he did not do so by May 30, 2000, the Agreement would terminate "automatically" and Monroe's earnest money would be returned. The letter, signed "Monroe Property Co., LLC," was apparently returned, but Lipson now denies having signed it.

In August 2000, the parties signed a document entitled "Amendment to Condominium Unit Construction, Purchase and Sale Agreement for Bachelor Gulch Village Resort and Spa" (the "August 2000 Amended Agreement") which purported to amend the amended 1999 Agreement to provide for an effective date of September 1, 2000.

In February 2002, Lipson, on behalf of Monroe, entered into a contract with an entity named 575M LLC ("575M") to assign its purchase rights under the Bachelor Agreement to 575M. 575M terminated that contract one month later, citing Bachelor Gulch's refusal to consent to the assignment. Monroe demanded an explanation, which was not given at the time. Since then, Bachelor Gulch explained that concerns about the creditworthiness of 575M and what Bachelor Gulch believed was its principal's history of litigiousness led it to demand certain assurances and concessions as prerequisites to consent, but it denies it ever "refused" to consent to the assignment.

On June 4, 2002 Mandel wrote Lipson to announce the pending completion of the project and a grand opening date in November 2002. Mandel offered Lipson the "option" of extending the closing date for the penthouse condominium to October 9, 2002, but also stated that Monroe could keep its original closing date if it desired. By letter dated June 24, 2002, counsel for Monroe not only rejected the offer to extend the closing date, but terminated the Agreement. Counsel expressed the view that "earlier purported extensions of the Closing Date were not properly executed" and concluded the terms and conditions of § 9.1 of the Agreement providing for completion and closing within two years of Agreement's effective date had therefore "not been satisfied." This, together with what counsel characterized as Defendants' "unlawful refusal to consent to the Assignment of our clients [sic] Agreement with 575M," triggered Monroe's right under the Agreement to terminate. Counsel concluded by informing Defendants that Monroe was "exercising its right to terminate the [Agreement] today rather than extending the Closing Date pursuant to [the] June 4, 2002 offer," and demanded an immediate return of Monroe's earnest money plus interest.

Counsel for Monroe responded with a letter dated June 26, 2002, asking for an explanation of the basis for the opinion that the Agreement was terminable by Monroe and declining to return the earnest money. Rather than respond, Monroe filed suit, filing its Complaint for Declaratory Judgment and Other Relief and Jury Demand in this court on July 31, 2002.

Bachelor Gulch was served with Monroe's Complaint on August 5, 2002. Notwithstanding that fact, Mandel wrote Lipson on August 16, 2002 to announce the residence at the Ritz–Carlton Bachelor Gulch Village was "almost complete" and

to provide him with an October 9, 2002 closing date. "Please consider this letter," Mandel concludes, "the closing notice under Section 9.1.1 of your purchase agreement."

Given the position taken in its July 31, 2002 Complaint, Monroe did not close on the property. Defendants sold Monroe's unit sometime after October 9, closing in February 2003.

### *The Contract.*

The original 1999 Agreement provided for an effective date of December 22, 1999. Section 9.1 of the Agreement established the closing date for the condominium unit purchase. Section 9.1.1 addresses expectations regarding completion; § 9.1.2 addresses delays; and 9.1.3 addresses Purchaser's termination rights. Section 18 of the Agreement governs the parties' respective remedies for default by the other and termination of the Agreement.

In relevant parts, the Agreement provides:

**9.1.1 Completion.** Subject to Sections 8 [governing Seller's right to terminate early on if Seller did not have purchase contracts for all 23 units by June 1, 2000] and 9.1.2(b) [governing delays caused by Purchaser change orders] below, Closing shall occur on the date five (5) days following issuance by the County of a temporary Certificate of Occupancy for the Residence. Seller will give at least 20 days written notice to Purchaser of the anticipated Closing Date. The Closing Date will not be later than the date which is two (2) years from the Effective Date (the *"Outside Closing Date"*), unless: (i) Purchaser elects to extend the Closing Date pursuant to Section 7.3 [governing defects in title], (ii) the Outside Closing Date must be extended due to requirements of any governmental, quasi-governmental, or private entity having jurisdiction over any aspect of the Project.

**9.1.2 Delay.** [Providing for extensions of the Outside Closing Date for force majeur delays (9.1.2(a)) and delays caused by changes ordered by the Purchaser (9.1.2(b)) ].

**9.1.3 Termination.** If Purchaser elects to terminate this Agreement due to Seller's default under Section 9.1.1, the Seller will return to Purchaser the Earnest Money (plus any interest accrued thereon), and Purchaser and Seller will have no further obligations under this Agreement.

**18.1.1** If Purchaser defaults in the performance of any obligation under the Agreement which Purchaser is obligated to perform on or before the Closing, Seller will be entitled to keep as liquidated damages all moneys paid by Purchaser to Seller under this Agreement. The parties agree that Seller's actual damage may be difficult to ascertain, and the amount of the Earnest Money (plus and interest accrued thereon) ... approximates the damages Seller would sustain in the event of a default by Purchaser.

**18.2 Default by Seller.** If Seller defaults in the performance of any obligation under this Agreement which Seller is obligated to perform on or before the Closing, and if such default continues uncured for more than thirty (days) after written notice of the default from Purchaser to Seller, Purchaser may terminated this Agreement, in which event Purchaser will be entitled to a return of the Earnest Money (plus any interest accrued thereon) ....

**18.3 Attorneys' [sic] Fees.** [Providing that if either Purchaser or Seller initiates any action to enforce or interpret the Agreement, the party determined by the court of arbiter to be the "prevailing party," shall be entitled to receive "all reasonable costs and expenses, including all reasonable attorneys' fees" from the non-prevailing party.]

The Agreement, thus written, contemplated all of the eventualities that have come to pass between the parties. Specifically, it contemplated the completion of the project and closing on the purchase within two years of the effective date of the Agreement, the need for extensions or modifications of that closing date under limited circumstances, rights on the part of both purchaser and seller to terminate the Agreement if the other failed to perform its obligations, provided for the return of the purchaser's earnest money or its retention as liquidated damages depending on which side defaulted under the Agreement, contemplated the possibility that legal action might be undertaken to enforce and interpret the Agreement, and provided for the prevailing party in the event of such legal action to recoup its fees.

### The Complaint.

After two amendments, Monroe's Complaint for Declaratory and Other Relief asserts four claims against Defendants Bachelor Gulch Resort, LLC, Vail Resorts Development Co. and Ritz–Carlton Hotel Company, LLC (collectively "Bachelor Gulch" or "Defendants"). *See* Am. First Am. Compl. for Declaratory Jm. and Other Relief and Jury Demand (filed May 8, 2003). For its First Claim for Relief, Monroe seeks a declaratory judgment that the Agreement was law fully terminated—either effective June 1, 2002 based on Lipson's failure "fully [to] execute" the May 15, 2000 letter agreement from Mandel or effective June 24, 2002, by virtue of Defendants default under § 9.1.1 of the Agreement and wrongful refusal to consent to the 575M assignment—and that Monroe is entitled to the return of its earnest money under Agreement § 9.1.3, plus interest (Count I). (Compl.¶¶ 25, 27.) Monroe's Second and Third Claims for Relief assert separate causes of action for breach of contract, first based on Defendants' alleged failure to provide notice of a closing date on or before September 1, 2002

(Count II) and second based on Defendants' "unlawful withholding of consent" for the assignment of rights to 575M (Count III). Monroe's final cause of action purports to sound in tort, claiming that by withholding consent to the 575M assignment, Defendants intentionally interfered with Monroe's assignment agreement with 575M (Count IV.) For its relief on each of their claims II, III and IV, Monroe seeks "monetary damages including but not limited to a return of the $866,250 earnest money deposit plus interest." On the tort claim, Monroe also seeks damages for "lost profits."

For their part, Defendants deny Monroe had any basis to terminate the Agreement in June 2002 and assert a counterclaim against Monroe for anticipatory breach. For their relief, Defendants seek the right to retain Plaintiff's earnest money as liquidated damages pursuant to § 18.1.1 of the Agreement, or, in the alternative, actual damages in an amount to be proven at trial.

Both Monroe and Defendants seek an award of fees under Agreement § 18.3.

The case is before me on cross-motions for summary judgment. Defendants seek summary judgment on each of Monroe's four claims against them, and Monroe seeks summary judgment on Defendants' counterclaim for anticipatory breach. I find the claims and defenses overlawyered and overwrought. Rather than address each of the parties' multiple and varied arguments seriatim, I issue the following rulings in an attempt to distill this litigation to its essence, which is far less complex than the pleadings and briefing suggest.

### Overall Impression.

This is an action seeking a declaration of rights and obligations under the parties' 1999 Purchase and Sale Agreement. The parties' expectations with respect to those rights and obligations were bargained for and are governed exclusively by that Agreement, and the nature of their claims against each other in this case is the enforcement of those contractual expectations or, perhaps in the alternative, damages incurred based on the other side's failure to abide by them. While Monroe's claim that the Agreement actually terminated in 2000 and the parties simply went on for two years acting as though it hadn't barely survives scrutiny under Rule 11, its request for declaratory judgment in Claim I of its Complaint is at the heart of this dispute. The parties' remaining claims, whether sounding in contract as claims for breach or in tort, lack any independent theoretical footing.

Specifically, Defendants' duties to consent reasonably to assignments proposed by Monroe (Counts III and IV), to provide a closing date within two years of the Agreement's Effective Date (Count II), and to honor Monroe's right to terminate generally are duties that arose solely by virtue of the Agreement. Under these circumstances, Defendants' alleged violation of these duties is a matter governed exclusively in contract, and no alternative theory of tort liability for their violation will lie. Monroe's claim for intentional interference with contract, therefore, is barred as a matter of law.

As to the merits of Monroe's breach of contract claim based on Defendants' withholding of consent, the Agreement gave Defendants the unfettered right to give or to deny consent to any assignment and Monroe's claim is therefore barred under the express terms of the Agreement.

Monroe's breach of contract claim based on Defendants' alleged violation of Agreement § 9.1.1 states no independent cause of action for damages and is part and parcel of the determination in Claim I of the parties' rights and obligations under the Agreement. If Monroe is determined

to have complied with his obligations under the Agreement, and Defendants are found to have defaulted on theirs, Monroe will be entitled to a return of his earnest money as his remedy for that "breach."

Similarly, Defendants' counterclaim against Monroe for anticipatory breach is less an independent cause of action for damages than the counterargument to Monroe's claim for declaratory relief and a request for the opposite declaration. If Defendants are deemed not to have defaulted under § 9.1.1 of the Agreement, or if Monroe is deemed to have failed otherwise to perform its obligations, Defendants will be entitled by operation of § 18.1.1 of the Agreement to retain Monroe's earnest money deposit as liquidated damages. No cause of action for anticipatory breach could survive declaratory judgment, because a determination that Monroe is entitled to a return of its earnest money would preclude it.

Accordingly, this case is, at its essence, an action under § 18 of the Agreement for a declaration of the parties' respective rights and obligations with respect to termination and default and to enforce the Agreement's provisions with respect to Monroe's earnest money. All of the haranguing and briefing on issues such as the statute of frauds, tort liability, and damages lie outside the contract and have served only to obscure the issues and protract the proceedings.

### Rulings.

1. *Monroe's Claim for Declaratory Relief Based on the Alleged Failure "Fully [to] Execute" the May 15, 2000 Letter from Mandel to Lipson Fails as a Matter of Law.*

■ In support of its claim that the Agreement actually terminated by its own terms on June 1, 2000 notwithstanding its conduct for the next two years, Monroe claims the proposed letter amendment from Mandel dated May 15, 2000 was "never fully executed by Monroe Property Company, LLC." (Am. First Am. Compl. ¶ 25.) The assertion strains the bounds of Rule 11 and fails, in any event, under a Rule 56 standard.

It is undisputed that the letter amendment was signed in the appropriate space with a handwritten representation of "Monroe Property Co. LLC" and that the parties proceeded after June 1, 2000 to act in accordance with the Agreement. Even assuming neither Lipson nor any other representative of Monroe signed the May 15 letter, it is undisputed that Lipson did sign the Amendment to Condominium Unit Construction, Purchase and Sale Agreement for Bachelor Gulch Village Resort and Spa on August 2, 2000. The Amendment acknowledged the 1999 Agreement, recited that Monroe and Bachelor Gulch were presently parties to it, acknowledged the Agreement "had been duly amended by that certain May 15, 2000 Letter Agreement between Seller and Purchaser," and further amended the effective date of the Agreement for "an additional period of time to September 1, 2000". (Aug. 2, 2000 Amended Agreement, Tab 3 to Pl.'s Am. First Am. Compl.)

It is also undisputed that on February 15, 2002, Lipson signed the Assignment Agreement with 575M on behalf of Monroe affirming the existence of a viable Agreement, attaching that Agreement to the Assignment Agreement, and purporting to assign existing "rights and obligations" under that Agreement to 575M. To claim now that he agreed in August 2000 to amend an Agreement that no longer existed, and then agreed in February 2002 to *assign* that nonexistent agreement to a third party for *profit*, reveals a level of disregard for the facts (and potential fraud) as begs a motion under Rule 11. Monroe's attempt to manufacture a factual basis for such a claim by asserting the lack of any

"name written, typed, or printed of any person signing on behalf of Monroe Property Company, LLC" on the May 15 letter agreement is facile and inadequate to overcome summary judgment. Monroe's invocation of the statute of frauds to deny an extension of the 1999 Agreement's effective date was possible without a formal written amendment is misplaced, as is the suggestion that the statute of frauds precludes the argument that Monroe's post-June 2000 conduct ratified the proposed extension. Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Defendants claim that the Agreement actually terminated on June 1, 2000.

2. *Both Monroe's Claims in Contract and in Tort for Liability Based on Defendants' Unreasonable or Wrongful Withholding of Consent to the 575M Assignment Fail as a Matter of Law.*

 Section 16 of the Agreement is entitled "Assignment." Section 16.1 of the Agreement states:

**16.1 By Purchaser.** This Agreement is personal to Purchaser, and Purchaser may not assign this Agreement without the prior written consent of Seller, which consent may be granted or withheld in Seller's *sole and absolute discretion;* provided, however, that Seller's consent will not be required for any assignment by Purchaser to any member of Purchaser's immediate family, or any corporation or other entity which controls, is controlled by, or is under common control with Purchaser (each a *"Permitted Assignment"*).... Any purported assignment of this Agreement without Seller's written consent, other than a Permitted Assignment, will be voidable and, at Seller's option, will place Purchaser in default of this Agreement. *Seller's refusal to consent to an assignment of this Agreement will not entitle Purchaser to terminate this Agreement or give Purchaser any rights or claims for damages against Seller.*

Agreement (Tab 1 to Pl.'s original Compl.)[1] at 13 (emphasis mine). Monroe acknowledges this language, but contends it is "unenforceable" under Colorado law to the extent it would shield Defendants from liability for "constructively withh[olding] their consent to the assignment to 575M unreasonably, arbitrarily, capriciously, vexatiously, maliciously, or [otherwise] in violation of the public policy of Colorado." (Compl.¶ 37.) Monroe further contends Defendants' actions violated the duty of good faith and fair dealing implied in every Colorado contract. Neither liability theory avails.

 Monroe provides no authority for its assertion that a party given unfettered discretion to reject a proposed assignment of rights in a contract may nevertheless be held liable for breach if it exercises that discretion "unreasonably, arbitrarily, capriciously, vexatiously, or maliciously," and I can find none. In Colorado, "[c]ontract rights generally are assignable, except where assignment is prohibited by contract or operation of law." *Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co.,* 874 P.2d 1049, 1052 (Colo.1994). The plain language of the contract is used to determine the parties' intent with regard to the assignment of rights. *Id.* at 1055. Here, the plain language of the Agreement contemplated assignment only with Defendants' consent, and gave Defendants sole and unequivocal discretion to grant or withhold that consent. No conditions were placed on the manner or exercise of this discretion—it was exclusive and unfettered. In case any ambiguity could be

---

1. Note: the copy of the 1999 Agreement attached to Plaintiff's Amended First Amended Complaint is missing p. 9, so citations to the Agreement in this Order refer to the complete copy attached at Tab 1 to Plaintiff's original Complaint.

inferred from that, the parties in addition specifically agreed that "no rights or claims for damages" would arise from Defendants' nonconsent. To argue now that "sole and absolute discretion" actually means "reasonably and nonarbitrarily exercised discretion" is unavailing under any standard of contract construction.

■ Nor does the general duty of good faith implied in Colorado contracts rewrite the express terms of the contract. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995). "The duty of good faith and fair dealing is generally used to effectuate the intentions of the parties or to honor their reasonable expectations," and it will not be construed to "contradict terms or conditions for which a party has bargained." *Id.* at 498. Here, the language of the Agreement clearly and unambiguously evinces a bargained-for expectation that Defendants were authorized to refuse to consent to any assignment for any reason without risk of civil liability for doing so. The implied duty of good faith cannot alter these bargained-for expectations.

■ To the extent a duty of good faith and fair dealing is implied generally in the Agreement, the burden of proof for establishing the violation that duty falls on the plaintiff and a determination must be made "based upon information available to the defendant at the time of the actions claiming to be wrongful and the standards of conduct then existing in the industry." *Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1108 (Colo.App.1990). Here, the only evidence presented supports Defendants' position that they acted reasonably and in good faith in investigating and questioning the proposed assignment. This evidence includes the fact that the principal of the proposed assignee had used an alias when approaching Bachelor Gulch, had been involved in litigation over a nearby condominium and redevelopment project, and whose intentions with respect to the Bachelor Gulch condominium included the possibility of combining it structurally with an adjacent unit to form a single bigger unit. Other than declaring Defendants refused to explain the reasons for their actions in questioning the principal, Monroe has come forward with no evidence to create a triable issue on the question of Defendants' bad faith in their handling of the proposed 575M assignment.

Accordingly, Monroe's claim for breach of contract based on Defendants' "constructive refusal" to consent to the 575M assignment fails as a matter of law.

■ With respect to Monroe's Fourth Claim for Relief for Tortious Interference based on Defendants' refusal to consent to the 575M assignment, this claim, too, fails as a matter of law.

Neither side spends much time on Monroe's Fourth Claim for Relief that Defendants' refusal to consent to the 575M assignment gives rise to liability in tort for intentional interference with Monroe's assignment agreement with 575M under Restatement (Second) of Torts § 767. The elements of such a claim are set forth in *Memorial Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo.1984), but I do not consider them because Monroe's claim is not viable under the economic loss doctrine as recognized in Colorado.

Specifically, the parties' expectations and obligations with respect to the granting or withholding of consent by Defendants were matters bargained for and governed exclusively by § 18 of the Purchase and Sale Agreement. Monroe expressly agreed it would have no rights or claims against Defendants for losses incurred as a result of Defendants' refusal to consent to an assignment, and it cannot now assert a right to recover in tort that which it bargained away in contract. *See Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1109

(Colo.App.2004)(citing *Town of Alma v. Azco Constr., Inc.,* 10 P.3d 1256 (Colo. 2000) and describing the economic loss rule as preserving the distinction between contract and tort law when only economic damages are sustained).

Even if the economic loss rule did not preclude Monroe's claim for tortious interference with contract, Monroe has come forward with no evidence to support a claim under § 767 of the Restatement, in particular no evidence that the interference with Monroe's assignment agreement with 575M was either intentional or improper under the standards set forth in the Restatement. Defendants' Motion for Summary Judgment is granted on Monroe's Fourth Claim for Relief.

3. *Neither Monroe's Breach of Contract Claim based on Violations of § 9.1.1 and Defendants' Counterclaim Stand as Independent Causes of Actions for Damages.*

The parties' rights and obligations to each other on the contract will be resolved on the parties' competing requests for declaratory relief. The sole remaining issues in this case are whether Monroe was entitled in June 2002 to terminate the Agreement under §§ 9.1.1 and 9.3, and, if so, whether Monroe complied with the procedure set forth in § 18.2 in terms of notice and allowing Defendants time to cure. If the answer to both questions is "yes," then Monroe is entitled to the return of its earnest money and Defendants have no claim for anticipatory breach. If the answer to either question is "no," then Defendants are entitled to retain Monroe's earnest money as liquidated damages under § 18.1.1 of the Agreement and there is no separate or independent claim for anticipatory breach.

ACCORDINGLY, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part, and Plaintiff's Motion for Summary Judgment is DENIED as moot. This matter will proceed to trial on competing claims for declaratory judgment and request for specific enforcement.

### Right to Jury Trial.

■ Given my rulings disposing of the parties' breach of contract and tort law claims, the question arises as to whether the right to jury trial remains. I conclude that it does.

■ The appropriate analysis for deciding the question is set forth in *Fischer Imaging Corp. v. General Elec. Co.* 187 F.3d 1165, 1169–71 (10th Cir.1999). In *Fischer,* the Tenth Circuit reversed the striking of plaintiff's jury demand in a declaratory judgment action because the action, without the procedural vehicle of declaratory relief, would have sounded in contract. A litigant is not deprived of a jury trial merely because an action in which it is a party is one for declaratory judgment. 9 Wright & Miller, Federal Practice and Procedure Civ.2d § 2313 (applied in *Fischer* ). Although the origin of the declaratory judgment procedure rests largely in equity, the remedy itself is neither legal nor equitable. *Id.* Thus, to determine whether there is a right to jury trial in a declaratory judgment action, it is necessary to determine in what kind of an action the issue would have come to the court if there were no declaratory judgment procedure. *Id.* In the instant case, this already contract-based action would have had to proceed as an action for breach of contract without the device of declaratory relief. Monroe would have had to have waited until the outside closing date had passed, complied with the provisions of § 18.2 regarding notice and opportunity to cure and, if Defendants refused to return its earnest money under § 9.3, sued Defendants for breach of contract. Without an action for declaratory relief, the only claim Defendants could have would be one for breach of contract (but

that claim has actually never ripened, because Defendants have not "lost" Monroe's earnest money).

Accordingly, trial will be to a jury. Irrespective of the right to a jury, however, it is worth questioning whether either side truly wishes to pursue it. The parties are encouraged to confer regarding the substance of this order and tailor their claims, defenses and stipulations of fact accordingly. If a referral to a magistrate judge for settlement would be helpful, either side may call my chambers to request it. In the meantime, this case will be set for a pretrial conference by separate Minute Order.